**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

JESSIE AROMIN DELOSO,
　　　　　　　　　*Petitioner,*

　　　　　v.

JOHN ASHCROFT, Attorney General,
　　　　　　　　　*Respondent.*

No. 02-72317

Agency No.
A70-778-153

AMENDED
OPINION
DENYING
REHEARING

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted
May 13, 2004—San Francisco, California

Opinion Filed August 2, 2004
Amended January 3, 2005

Before: Betty Binns Fletcher, Stephen S. Trott and
Raymond C. Fisher, Circuit Judges.

Opinion by Judge Fisher

1

## COUNSEL

Lizbeth A. Galdamez and Michael P. Karr, Sacramento, California, for the petitioner.

Jeffrey J. Bernstein and John M. McAdams, Jr., United States Department of Justice, Office of Immigration Litigation, Washington, D.C., for the respondent.

Beth Werlin and Trina Realmuto, Washington, D.C., for amicus curiae American Immigration Law Foundation.

## OPINION

FISHER, Circuit Judge:

Jessie Aromin Deloso, a native and citizen of the Philippines, petitions for review of the denial of his request for asylum and withholding of deportation. Deloso also challenges the summary affirmance procedures of the Board of Immigration Appeals ("BIA") and has moved for a stay of voluntary departure pending judicial review.

Deloso unquestionably suffered what would appear to be persecution: within the space of two years, he was shot at by unknown gunmen, attacked by a group of men carrying knives and set upon on another occasion by a man armed with a pipe; he received death threats shortly after the assassination of another member of his political party who held local office; and, even after he relocated to another part of the Philippines, he was followed by a man he identified as the son of his

father's political enemy such that he did not feel safe staying in one location for very long. The question presented here, however, is whether any of these actions were on account of his political opinion.

Although the police never found out who was responsible for these acts, Deloso believes that Apolino Advincula — the head of a criminal organization and also a Communist party member and hit man — was the most likely instigator. Advincula had two potential motives. First, as a Communist party henchman, he often did "favors" for Communist politicians by ridding them of opposition party candidates. Deloso's father, Sixto Deloso — who was elected as a councilor of their hometown of Bacoor shortly before the incidents affecting Deloso — was such a person, as a member of the Strength of Democracy party and as a politician who was interested in reforms that might have interfered with Communist party efforts to entice youths to join the party with the lure of illicit drugs. Moreover, Deloso worked as the youth leader of his father's campaign. Advincula therefore could have been asked to frighten Sixto Deloso and his politically active son, causing the entire family to flee Bacoor.

On the other hand, Advincula could have been motivated by a more personal desire: revenge. Sixto Deloso, before running for councilor, had served as the leader of a nonpartisan neighborhood association and, in that role, had informed the police about Advincula's criminal enterprises. Consequently, Advincula spent three weeks in jail.

The Immigration Judge ("IJ") apparently assumed that Advincula was responsible for the events but that he was motivated only by vengeance. The IJ made this determination, however, without the benefit of two *en banc* opinions that clarified our law on cases involving mixed motives such as those present here. *See Borja v. INS*, 175 F.3d 732, 736 (9th Cir. 1999) (en banc); *Briones v. INS*, 175 F.3d 727, 729 (9th

Cir. 1999) (en banc).[1] These opinions held that an applicant need only "produce evidence from which it is reasonable to believe that the harm was motivated, *at least in part*," by a protected ground. *Borja*, 175 F.3d at 736 (emphasis added) (quoting *In re T-M-B-*, Interim Dec. No. 3307 (BIA Feb. 20, 1997)). The record compels the conclusion that the harms inflicted here were at least in part on account of Deloso's political opinion. There is no question that Advincula was a hit man for the Communist party and thus could have been acting at the behest of his political masters. Further, direct evidence linked the attacks to the Communist party — the party's hammer-and-sickle emblem was left at two of the locations where incidents occurred. In addition, the incidents began shortly after Sixto Deloso was elected councilor and occurred during the period in which another Strength of Democracy member, the mayor of Bacoor, was assassinated. Further, one attack occurred when Deloso and his father were en route to a political meeting.

Because the Delosos' unrefuted testimony and other record evidence compel a finding that the harm Deloso suffered was, at least in part, on account of his political opinion, we grant the petition and remand for further proceedings.

## I.

### A.   Factual Background

The following facts are drawn from the testimony of Deloso and his father. Although the IJ noted several inconsistencies between the testimony and Deloso's written application, he did not make an explicit credibility finding. We therefore have to credit the testimony as true. *See Lopez v. Ashcroft*, 366 F.3d 799, 802 (9th Cir. 2004).

---

[1]The BIA's summary affirmance occurred several years after *Borja* and *Briones* were issued. The BIA's decision did not refer to either opinion, however, even though Deloso referred to both in his brief on appeal.

Deloso lived with his parents and seven siblings in Bacoor from 1974 until the spring of 1988. In 1988 all of Deloso's family — except for Deloso and one of his sisters who lived in Manila — left the Philippines due to Sixto Deloso's fears for their safety. Sixto Deloso had good cause to be frightened: shortly after he was elected as councilor of Bacoor as a candidate for the democratic party, "Strength of Democracy," he and his family were attacked, their store was ransacked and they received death threats.

The campaign of terror apparently began in February 1987, the same month in which Sixto Deloso was elected as councilor on a platform pledging, among other things, "total eradication of communism in the entire municipality." On their way to a political meeting, Deloso, his brother Marlon and Sixto Deloso were ambushed. Their jeep was riddled with bullets and flipped over due to the driver's fright. The passengers suffered a few bruises, but no other injuries. Although Deloso and his father testified that they did not know who was to blame, documents within the record implicate the Communists. Deloso and his brother Marlon in their respective asylum applications blamed the attack on the military arm of the Communist party, the New People's Army, and Sixto Deloso in an affidavit claimed that "communist gunmen" were responsible.

The next month, in March 1987, an unknown person ransacked and stole food from the family's store, located in the Queens Row neighborhood in which they lived. Deloso and his father stated they believed that Communists were responsible because the marauders left behind a calling card — a Communist emblem, the hammer and sickle, drawn on the wall of the store.

A few months later, in June 1987, unknown assailants assassinated another Strength of Democracy party member, the mayor of Bacoor, Lito Miranda. Deloso stated he believed that one of the other political parties — and most likely the

Communist party — was to blame for Miranda's death. Sixto Deloso testified that people suspected Advincula was to blame, but that no one knew for sure. In an affidavit, he also claimed that the Communists had assassinated Miranda.

After Miranda's killing, Sixto Deloso started to think that he should resign his political office. His worries were compounded several months later, when he and his family began to receive death threats. In August 1987, an unsigned letter was found in the gate to the family's yard, stating "beware because you're next." The letter included 10 crosses that Deloso's father interpreted to represent himself, his wife and their eight children.

Later that month, Sixto Deloso found a funeral garment, called a barong tagalog, on the porch of the Deloso home. The garment was covered with sand and stones, which Sixto Deloso interpreted as suggesting that "you are dead, you will wear the barong tagalog, and they will dig a hole and later . . . your corpse will be . . . put there inside the hole, and then you will be covered by sand and gravel." Jessie Deloso confirmed that leaving the garment was a "sign that you're going to be killed and you're next." Although the translation made his testimony somewhat confusing, Sixto Deloso did state that a hammer-and sickle emblem was also found with or near the barong tagalog.[2]

Deloso and his father testified that they reported these incidents to the police, even though they had to travel two hours to reach the nearest police station. They also stated that, because of the distance and lack of resources, they believed that the police were unable or unwilling to provide much long-term support to protect them from the people or groups

---

[2]Deloso's counsel stated at oral argument that no such emblem was found with the barong tagalog. Because Sixto Deloso testified that there was, however, we shall assume that counsel overlooked his testimony in that regard.

threatening them. Consequently, shortly after receiving the barong tagalog, most of the family decided to relocate before the threats could be carried out.

Deloso nonetheless remained in Bacoor until two further incidents occurred. In July 1988, he was chased by men, who appeared to be intoxicated and who were carrying knives and a large pipe. One man was able to punch Deloso before he could escape. Then, in late 1988, Deloso was assaulted one evening by unknown persons, who were supposedly sent by the Advincula family to kill him. A group of men followed Deloso after he finished playing basketball, apparently with one of the youth leagues he started as part of his father's political campaign. The men had knives and set upon him on a dark street corner. The friends with whom Deloso had been playing basketball came upon the melee, and the attackers fled. Deloso's father, who by that time was living in the United States, then recommended that Deloso leave Bacoor.

Deloso took his father's advice and moved to Manila, which is about an hour away from Bacoor and home to one of Deloso's sisters. In Manila, he observed that he was being followed by one of the Advincula brothers and so was constantly on the move to avoid detection; he would only bide approximately a week at the same location. He felt that he would "definitely" be killed if the man following him ever found him alone. Deloso soon thereafter enlisted in the Philippines Merchant Marine, in part to elude the Advinculas. He worked in the Merchant Marine from 1989 to 1992, when he entered the United Sates.

Although Deloso and his father were not sure who was to blame for these incidents, they both testified that either the Communist party or Advincula, one of Deloso's political enemies, probably was at fault.

Advincula was the head of a criminal organization that sold drugs in the Delosos' neighborhood. He and his sons were

members of the Communist party, and Advincula was paid by Communist politicians to harass and kill political opponents. Sixto Deloso testified that Advincula also trafficked in drugs for the benefit of the party, contributing profits from his drug sales to Communist party coffers and supplying drugs to the party as a lure to get youths to join.

Sixto Deloso came into conflict with Advincula while serving as the president of the Queens Row Homeowners' Association, a position he held from about 1981 to 1986, before running for councilor. During his tenure, he worked to remove delinquents and other criminals from the neighborhood and in particular to check the influence of the Advincula crime family. As part of these efforts, he was instrumental in getting Advincula arrested for drug crimes sometime between 1981 and 1985. Advincula was never brought to trial and was released after three weeks. Sixto Deloso believed Advincula escaped so lightly due to his political connections.

## B.   Procedural Background

Deloso entered the United States in 1992. On February 17, 1994, the INS charged Deloso with deportability under § 241(a)(1)(B) of the INA, 8 U.S.C. § 1251(a)(1)(B). On June 20, 1994, Deloso applied for asylum and withholding of deportation under section 208(a) of the INA, 8 U.S.C. § 1158(a). His claim was based upon allegations that he was persecuted on account of his political opinion and on account of his membership in a social group, the Deloso family.

The IJ assumed that Advincula was responsible for the incidents affecting Deloso, but found that Advincula was entirely bent on revenge for Sixto Deloso's efforts to inform on Advincula and therefore denied Deloso's asylum application because "[t]here is no persecution in this case on one of the" protected grounds. The BIA affirmed the IJ's decision on June 27, 2002, and granted Deloso a 30-day voluntary departure period. Deloso filed a timely appeal on July 24, 2002.

## II.

Where, as here, the BIA adopts the IJ's decision, we review the IJ's decision as if it were that of the BIA. *Wang v. Ashcroft*, 341 F.3d 1015, 1020 (9th Cir. 2003). In reviewing a decision of the BIA to deny asylum and withholding of removal, we examine whether the decision is supported by substantial evidence. *Halaim v. INS*, 358 F.3d 1128, 1131 (9th Cir. 2004). "We must uphold [factual] findings unless the evidence compels a contrary result." *Id.* Because neither the IJ nor the BIA made an explicit adverse credibility finding as to Deloso and his father, we must also accept their testimony as true. *See Lopez*, 366 F.3d at 802.

**[1]** To be eligible for asylum, Deloso must show that he is unwilling or unable to return to his country of origin because of "persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A). An applicant can make this showing, and be eligible for asylum, in two ways. First, the applicant can show past persecution on account of a protected ground. 8 C.F.R. § 208.13(b)(1). Once past persecution is demonstrated, then fear of future persecution is presumed, and the burden shifts to the government to show, by a preponderance of the evidence, that "there has been a fundamental change in circumstances such that the applicant no longer has a well-founded fear of persecution," or "[t]he applicant could avoid future persecution by relocating to another part of the applicant's country." 8 C.F.R. § 208.13(b)(1)(i) & (ii). An applicant may also qualify for asylum by actually showing a well-founded fear of future persecution, again on account of a protected ground. 8 C.F.R. § 208.13(b)(2).

**[2]** In order to show past persecution, Deloso must demonstrate that an incident (1) rises to the level of persecution; (2) is on account of one of the five statutorily protected grounds; and (3) is committed by the government or forces the govern-

ment is either unable or unwilling to control. *Knezevic v. Ashcroft*, 367 F.3d 1206, 1211 (9th Cir. 2004). The IJ denied Deloso's petition because he had not established that the persecution alleged was on account of one of the five statutorily protected grounds. Deloso claims that he was persecuted on account of his political opinion. Thus he must also establish that he held an actual or implied political opinion and his persecutors knew of his political opinion or imputed a political opinion to him. *See Sangha v. INS*, 103 F.3d 1482, 1487-89 (9th Cir. 1997).

**[3]** We conclude that the IJ incorrectly determined that the harm Deloso suffered was not at least partly "on account of" his political opinion — an error perhaps explained by the decision being made prior to *Borja* and *Briones*. First, Deloso clearly established that he had a political opinion and that his tormentors would have been aware of it. *See Sangha*, 103 F.3d at 1488. Deloso spoke on approximately 50 occasions over a four- or five-month period in support of his father's run for councilor as a Strength of Democracy candidate and in opposition to the Communist party. Deloso stated in his asylum application that he also "consistently pointed out to the young generation . . . the evils of [C]ommunism and why [C]ommunism should be condemned at all cost[s]." Consequently, Deloso became well-known, in his own right, as a strong anti-Communist. At the very least, Sixto Deloso's political opinion was imputed to Deloso, given his efforts on behalf of his father's candidacy.

The question of whether the persecution alleged was on account of this political opinion is closer. Although the exact identity of the Delosos' tormentors is unclear, much of the testimony suggests that Advincula and his followers were responsible for the death threats and other harassment of the Deloso family, and the IJ assumed that Advincula was responsible. The evidence revealed that Advincula had two possible motives: (1) Advincula wanted revenge on Sixto Deloso because he had told the police about Advincula's drug activi-

ties, and, as a result, Advincula had spent three weeks in jail; and (2) Sixto Deloso ran for and won the office of city councilor as a member of the Strength of Democracy party on an anti-Communist platform, and Advincula was hired to threaten Sixto Deloso and his politically active family as a form of political opposition.

**[4]** "A persecutor may have multiple motives for inflicting harm on an asylum applicant. As long as the applicant produces evidence from which it is reasonable to believe that the persecutor's action was motivated, at least in part, by a protected ground, the applicant is eligible for asylum." *Hoque v. Ashcroft*, 367 F.3d 1190, 1198 (9th Cir. 2004); *see also Gafoor v. INS*, 231 F.3d 645, 650 (9th Cir. 2000); *Borja* 175 F.3d at 736; *Briones*, 175 F.3d at 729. An applicant need not present direct evidence of a persecutor's motives if there is compelling circumstantial evidence. *Gafoor*, 231 F.3d at 650.

**[5]** Assuming that Advincula was behind the violent actions and threats, as the IJ did, compelling circumstantial evidence establishes that he acted for political reasons as well as for revenge. First, the testimony is uncontradicted that Advincula was a hit man for the Communist party. He and his followers were paid by Communist politicians to harass and kill their political opponents, including candidates from the Strength of Democracy party to which Deloso and his father belonged. Moreover, Advincula spent only three weeks in jail when Sixto Deloso reported his drug trafficking; Sixto Deloso attributed this short period of incarceration to Advincula's "very close" relationship with the Communist politicians. Therefore, he had the motive and opportunity to attack the Delosos for his political cronies.

**[6]** Obvious signs also connected the violence and threats to the Communist party and suggested the political impetus behind the actions. When the Deloso family store was ransacked in March 1987, a Communist hammer-and-sickle emblem was left behind. Then, in August 1987, the same

emblem was found with the funeral garment left on the Delo-
sos' porch as a death threat.

Moreover, Deloso also submitted affidavits from three dif-
ferent people stating that his life was threatened by the Com-
munist party because he openly denounced Communism. One
of these affidavits is from the chief of police in Deloso's
hometown, and another is from someone who appears to be
a police captain.[3] The testimony of Deloso and his father also
suggested that they were afraid of the Communists. When
asked who he was afraid of in the Philippines, Deloso testified
that he was afraid of "the [C]ommunist people, the party what
they gonna do to me." When asked why Deloso was threat-
ened, Sixto Deloso testified that, "my son was involved in
politics, and those youth, those young guys, . . . they try to
concentrate their [speeches against] Communists, regarding
Communism." Sixto Deloso also stated that he feared for his
son's life if Jessie Deloso returned to the Philippines because
the Communists likely could find out about his son's return
and continue to torment him.

[7] The timing of the violent acts and threats against the
Deloso family also indicates that they were attacked for politi-
cal reasons. Sixto Deloso reported Advincula to the police,
and Advincula was jailed for three weeks, sometime between
1981 and 1985. It was not until at least two years later, how-
ever, after Sixto Deloso had been elected as councilor, that the
attacks on the Deloso family began. Indeed, the death threats
against the Delosos were much closer in time to the assassina-

---

[3]We recognize that document fraud from Filipino asylum applicants is
"common." State Department, 1997 Profile of Asylum Claims and Coun-
try Conditions for the Philippines ("To support [their] claims applicants
sometimes submit statements from police or government officials assert-
ing they are unable to protect claimants, and advising them to leave the
Philippines. Venality and document fraud are common and adjudicators
should exercise case in evaluating the authenticity of such evidence."). We
nonetheless accept these documents as authentic in the absence of any
finding to the contrary by the IJ.

tion of Mayor Lito Miranda, who was a member of the Strength of Democracy party. Shortly after Miranda was killed, the Deloso family received a death threat that the family should "beware because you're next." That same month, the Delosos found on their porch the death threat involving the funeral garb. Even the one attack that happened before Miranda's death seems more connected to the family's politics than to Advincula's desire for revenge: someone shot at Deloso and his father and brother when they were in the car on the way to a political meeting. Finally, both attacks on Deloso after his parents fled the country were close in time to his political activity on behalf of his father and in organizing youth basketball leagues for the Strength of Democracy party — an activity he continued after his father's departure.

[8] In short, it is "reasonable to believe that the harm was motivated at least in part" by Deloso's political opinion. *See Borja*, 175 F.3d at 736.[4] We therefore remand to the BIA for further consideration of Deloso's asylum petition in light of the foregoing analysis. *See INS v. Ventura*, 537 U.S. 12, 16 (2002); *Knezevic*, 367 F.3d at 1212.[5] For the same reasons, we also remand to the BIA Deloso's claim for withholding of

---

[4]Because we conclude that Deloso has established that he was harmed at least partly on account of his political opinion, we do not reach his argument that he was persecuted on account of his membership in a particular social group, the Deloso family.

[5]Although the IJ seems to have assumed the harm suffered by Deloso rose to the level of "persecution" and was "committed by the government or forces the government was either unable or unwilling to control," *Knezevic*, 367 F.3d at 1211, he did not explicitly so find; therefore, we remand the case for determination of these issues as well.

In doing so, however, we underscore the credible evidence that Deloso was attacked on several occasions, received death threats, was followed by the son of a political assassin who wanted to harm Deloso and the family store was ransacked. *See, e.g.*, *Baballah v. Ashcroft*, 367 F.3d 1067, 1074 (9th Cir. 2004) ("There is no question that persistent death threats and assaults on one's life, family, and business rise to the level of persecution within the meaning of the [Immigration and Nationality Act].") (internal quotation marks omitted); *Ruano v. Ashcroft*, 301 F.3d 1155, 1160 (9th

removal. *See* 8 C.F.R. § 208.16(b). The BIA shall determine whether Deloso qualifies for asylum and withholding of removal and, if appropriate, shall exercise discretion on behalf of the Attorney General with regard to asylum.

Deloso also claims that the BIA's application of its stream-lining procedures at 8 C.F.R. § 3.1(a)(7), deprived him of due process. We deny this claim as foreclosed by *Falcon Carriche v. Aschcroft*, 350 F.3d 845, 850-51 (9th Cir. 2003). We deny as moot Deloso's motion for a stay of his voluntary departure pending judicial review. *Elian v. Ashcroft*, 370 F.3d 897, 898-99 (9th Cir. 2004).

Respondent's petition for panel rehearing filed October 18, 2004, is **DENIED.** No further petitions for rehearing will be entertained.

**Petition for Review GRANTED. REMANDED.**

---

Cir. 2002) (finding past persecution where petitioner was "closely con-fronted and put in harm's way on numerous occasions by men he knew to be armed and out to get him") (internal quotation marks omitted). Moreover, Deloso complained about these incidents to the police who were unable or unwilling to prevent future attacks. Indeed, at the time Deloso left Bacoor, attacks were escalating rather than waning. *See Babal-lah*, 367 F.3d at 1078 (noting that "where non-governmental actors are responsible for persecution . . . we consider whether an applicant reported the incidents to police, because in such cases a report of this nature may show governmental inability to control the actors").