# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

AYUBBHAI VAHORA, aka A.A.
Vahora, aka Ayu Bhai A. Vahora,
                *Petitioner,*

v.

ERIC H. HOLDER JR.,* Attorney
General,
                *Respondent.*

No. 08-71618

Agency No.
A096-152-895

OPINION

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted
August 31, 2009—Pasadena, California

Filed April 5, 2011

Before: Alex Kozinski, Chief Judge, Stephen Reinhardt,
Circuit Judge, and Robert J. Timlin,**
Senior District Judge.

Opinion by Judge Timlin;
Dissent by Chief Judge Kozinski

---

*Eric Holder Jr. is substituted for his predecessor, Michael B. Mukasey, as Attorney General of the United States, pursuant to Fed. R. App. P. 43(c)(2).

**The Honorable Robert J. Timlin, United States District Judge for the Central District of California, sitting by designation.

4471

## COUNSEL

Robert B. Jobe and Arwin Swink, Law Office of Robert B. Jobe, San Francisco, California for the petitioner-appellant.

Tracie N. Jones, Trial Attorney, Office of Immigration Litigation, U.S. Department of Justice, Washington, DC for the respondent-appellee.

---

## OPINION

TIMLIN, District Judge:

Ayubbhai Vahora ("Vahora"), a native and citizen of India, petitions for review of the Board of Immigration Appeals ("BIA") dismissal of his appeal of the Immigration Judge's ("IJ") denial of his application for asylum. The IJ denied his application for asylum because he did not file it within one year of his arrival in the United States, as required by 8 C.F.R. § 208.4(a)(2), and because he did not demonstrate "changed circumstances" sufficient to excuse his late filing under 8 C.F.R. § 208.4(a)(5). We conclude that it was error not to find "changed circumstances" that warrant an exception to the one-year filing requirement, and we will grant the petition.

## I.

## FACTS AND PROCEDURAL HISTORY[1]

Vahora is a native and citizen of India who grew up and lived in the state of Gujarat in India. His parents are deceased, and he has four living siblings, two brothers and two sisters. He is married and has three daughters. His entire family remains in India.

Vahora and his family are Sunni Muslim, and the village in which they live is predominantly Hindu. Vahora was a member of the local Sunni Muslim committee in Gujarat. Prior to his entry into the United States, Vahora experienced three

---

[1]The facts described in this opinion are contained in Vahora's testimony at his asylum hearing, which the IJ found to be credible.

separate incidents of harassment and violence because of his religious affiliation. In 1992, the mosque in Vahora's town was destroyed by Hindus, and he was subsequently put in charge of the efforts to rebuild the mosque. During construction, Vahora saw young Hindu people attempting to demolish the walls of the mosque, so he went to the police station to lodge a report. Then he held a meeting at his house for the Muslim community to discuss the situation. After the meeting came to an end, the police came to Vahora's house and arrested him. The police detained Vahora for five days, during which time he was beaten 12-14 times for 10-12 minutes at a time. He was beaten so severely that he could not walk properly and received medical treatment. He was released after a friend paid a bribe. After his release, he was fired from his job by his Hindu employer.

On February 15, 1998, supporters of the Hindu nationalist Bhartiya Janta party ("BJP") came to Vahora's house and told him to instruct other Muslims to support the BJP. He refused, and one of the BJP supporters told him that, if he did not support the BJP, he and his family "would have to bear the brunt of the consequences." After the election, in which the BJP candidate lost, Hindus came to Vahora's house and harassed him with verbal abuse.

On September 28, 2000, in an effort to avoid further harassment, Vahora left India for a trip to London. Vahora admitted at the hearing before the IJ that he also applied for a visa to enter the United States at that time, but was denied because he did not submit a sponsor letter. A little over a month later, he returned to India, and three days later, he was once again arrested by the police and taken to the police station. The police alleged that he had gone to London to create plans to cause disturbance "in the Hindu areas" and detained him for fifteen days, during which time they beat him once or twice a day and alleged he was a traitor against the national interest. While in police custody, Vahora was not allowed to meet with anyone or contact his family or a lawyer. He was not charged

with a crime, and he did not have any court hearings. Once again, to be released, his family paid a bribe.

After his release, Vahora returned to London and stayed for four months. During this time, back in India, the police would come and question his wife about his whereabouts. Vahora admitted that he feared for his life while in London, but said at the hearing that he "was not thinking in terms of asylum" at the time he was in London and hoped he could return to India once the situation improved.

However, instead of returning to India, Vahora obtained a passport under a false name and entered the United States on April 5, 2001. Vahora admitted that he went to the United States after being in London, because he feared returning to India as the police continued to come to his house every few weeks and ask his wife about his whereabouts.

Vahora testified at the asylum hearing that he was not thinking of seeking asylum when he entered the United States, but that changed in February 2002, when Hindu rioting broke out in the Gujarat region.[2] Hindu fundamentalists burned down his family's house and farmhouse in late February. In August 2002, Vahora's brother, Karim, attempted to file a complaint with the police against those who destroyed the house. In response, the police arrested him, and his whereabouts are unknown.

In September 2002, a Hindu temple in the region was attacked, sparking further rioting in the region. The portions

---

[2]Vahora's account of the rioting in Gujarat is corroborated by a Human Rights Watch report detailing violence in the region: "The violence in 2002 started with an attack in Godhra on a train carrying Hindus. Fifty-nine people died when a train carriage caught fire. In a retaliatory spree by Hindu mobs, hundreds of Muslims were slaughtered, tens of thousands were displaced, and their property was destroyed. Two years later, Muslims still live in fear because their attackers remain free and continue to make threats, particularly against those involved in prosecutions."

of the Vahora family's house that had been rebuilt were destroyed again. Vahora's other brother, Husman, then went to the police to find out where Karim was, but the police warned him he would be arrested if he asked more questions. Fearing for his life, he fled to live in hiding. His family has been unable to locate him since that time. On December 16, 2002, Vahora filed an affirmative application for asylum, withholding of removal, and protection under the Convention Against Torture ("CAT"). On March 3, 2004, the IJ issued an oral decision finding Vahora removable and denying his application for asylum. The IJ pretermitted the asylum application because it was not filed within a year of his arrival in the United States, rejecting Vahora's argument that he demonstrated changed circumstances materially affecting his eligibility for asylum relief which excused his untimely application. The IJ reasoned as follows:

> The respondent knew upon entering the United States that conditions of the riots were causing troubles back in his homeland and that if he went back, it was reasonable to believe that he might have some difficulty . . .

> The fact that the respondent's home was destroyed or his farm house was destroyed and his brother Karim disappeared is not an extraordinary circumstance or change because there was considerable unrest in respondent's home area at the time he left there. Furthermore, since there was civil unrest continuing from the riots, the respondent should have known that it was quite likely that his brother Karim could encounter being arrested or that his brother Husman might leave home . . .

Vahora appealed the IJ's decision to the BIA, and the BIA remanded for "further proceedings, if necessary, and for a further decision by the [IJ] addressing [Vahora's] applications for withholding and deferral of removal." On remand, the IJ

granted Vahora withholding of removal and protection under CAT but reaffirmed its prior decision concerning Vahora's asylum application. Vahora again appealed, and the BIA affirmed, concluding that "no basis [exists] to disturb the [IJ's] conclusion that the destruction of [Vahora's] property and his brothers' disappearance do not constitute the requisite changed or extraordinary circumstances to except him from the 1-year filing deadline, particularly in light of the experiences and conditions that [Vahora] described having endured that caused him to flee from India." The BIA remanded the case to the IJ for the DHS to complete its investigation and examination and for entry of an order as provided by 8 C.F.R. § 1003.47(h). On April 10, 2008, the IJ entered a summary of the oral decision which reflected that Vahora's asylum application was pretermitted because it was not timely filed and because he did not demonstrate "changed" or "extraordinary" circumstances to excuse his late filing.

This petition for review followed.

## II

## ANALYSIS

### A. Jurisdiction

We have jurisdiction pursuant to 8 U.S.C. § 1252. We may review "the agency's application of the changed . . . circumstances exception to undisputed facts" as it relates to the one-year filing rule. *Dhital v. Mukasey*, 532 F.3d 1044, 1049 (9th Cir. 2008); *Ramadan v. Gonzales*, 479 F.3d 646, 649-50 (9th Cir. 2007) (holding that the BIA's application of the changed circumstances exception to undisputed facts presents a mixed question of fact and law subject to our review under section 106 of the REAL ID Act). Here, as the facts underlying Vahora's claim of changed circumstances are not in dispute, we have jurisdiction over the merits of the BIA's determination that Vahora did not demonstrate changed circumstances.

## B.   Standard of Review

Under 8 U.S.C. § 1158(a)(2)(B), an applicant has the burden of proving by clear and convincing evidence that he applied for asylum within one year of his arrival in the United States or, to the satisfaction of the IJ, that he qualifies for an exception to the one-year deadline for the existence of "changed circumstances." *See also* 8 C.F.R. § 208.4. On review, we must decide whether substantial evidence supports the BIA's conclusion that Vahora has not shown "changed circumstances" so that his asylum application should have been considered notwithstanding its late filing. *Dhital*, 532 F.3d at 1050. Where, as here, the BIA adopts the IJ's decision while adding its own reasons, this court reviews both decisions. *Kataria v. INS*, 232 F.3d 1107, 1112 (9th Cir. 2002).

## C.   Changed Circumstances

Vahora contends that his failure to file his asylum application within one year of the date of his arrival in the United States should be excused under the changed circumstances exception.[3] Pursuant to 8 U.S.C. § 1158(a)(2)(D), "[a]n [untimely] application for asylum of an alien may be considered . . . if the alien demonstrates to the satisfaction of the Attorney General the existence of changed circumstances which materially affect the applicant's eligibility for asylum." The Department of Justice ("DOJ") regulations, 8 C.F.R. § 208.4(a)(4)(i)(a), provide a nonexhaustive list of examples of changed circumstances, including "[c]hanges in conditions in the applicant's country of nationality" and "changes in the applicant's circumstances that materially affect the applicant's eligibility for asylum. . . ."

---

[3]Vahora has not contended that his asylum application is timely under the extraordinary circumstances exception. We therefore do not consider that exception here. *Martinez-Serrano v. INS*, 94 F.3d 1256, 1259 (9th Cir. 1996).

In rejecting his claim of changed circumstances, the IJ reasoned that Vahora had already experienced significant mistreatment and harassment by the police before he left India and it was reasonable for him to believe he would experience difficulties if he went back. Further, the IJ noted Vahora "knew upon entering the United States that conditions of the riots were causing troubles back in his homeland and that if he went back, it was reasonable to believe that he might have some difficulty . . . The fact that the respondent's home was destroyed or his farm house was destroyed and his brother Kari disappeared is not an extraordinary circumstance or change because there was considerable unrest in respondent's area at the time he left there." The BIA affirmed the IJ's finding, "particularly in light of the experiences and conditions [Vahora] described having endured that caused him to flee from India."

[1] We hold that Vahora demonstrated "changed circumstances" justifying the untimely filing of his asylum application, and that substantial evidence did not support the IJ's finding to the contrary. To begin with, the IJ plainly erred with regard to the significance of the change in conditions in India while Vahora was in the United States. As Vahora's testimony and country-conditions evidence show, the Gujarat riots beginning in February 2002 were "India's worst religious violence in decades." Although there had been ongoing tension between Muslims and Hindus in India prior to that time period and a number of incidents of violence related to that tension, these riots left an estimated 2000 Muslims dead. According to the United States Department of State International Religious Freedom Report 2003, the riots also wreaked other havoc: "[i]n addition, 100,000 Muslims were forcibly displaced from their homes, causing them to reside in makeshift camps throughout Gujarat. There were also numerous reports of the rape of Muslim women and girls. The Government closed the camps in mid-June, forcing the displaced to return to burnt houses and destroyed property, with the perpetrators still at large. The Gujarat state government and the

police were criticized for failing to stop the violence, and in some cases participating or encouraging it."

The IJ's characterization of the rioting as simply more of the same "considerable unrest" that had previously occurred in India is unsupported in light of the evidence presented at the hearing. Further, the IJ's assertion that these riots occurred prior to the time that Vahora entered the United States is incorrect, as is the suggestion that Vahora knew upon entering the United States that riots were causing trouble in India.

**[2]** Moreover, the rioting directly impacted the Vahora family in a very serious fashion. Vahora testified at the asylum hearing regarding the impact on his family. Because the IJ found Vahora credible, we must accept his testimony as true without corroboration. *See Vukmirovic v. Ashcroft*, 362 F.3d 1247, 1251 (9th Cir. 2004). He testified that, during the period of initial rioting, his family's house and farmhouse were burned down. Then in August 2002, past the one year deadline to file his asylum application, a series of truly devastating events occurred to Vahora's family. Vahora's brother Karim attempted to file a complaint with the police against the Hindu people he believed burned down their home. The police arrested him and he has not been seen since. Vahora's other brother, Husman, then demanded that the police give him information about Karim, and the police responded that they would also arrest him. Fearing for his life, Husman fled his home and lives in hiding, if indeed he is still alive.

**[3]** According to the IJ and the BIA, these events and their effect on Vahora were insufficient to show a material effect on his eligibility for asylum, because Vahora had already experienced mistreatment in India and should have expected it would continue if he returned. Their interpretation of "changed circumstances" is that once an applicant for asylum has experienced circumstances that arguably would establish a colorable claim for asylum within the statutory time period for filing, that applicant must file his application timely, or be

permanently barred from doing so, regardless of what circumstances occur afterwards. In essence, the IJ and BIA interpret "changed circumstances" as requiring the applicant to show that, prior to the change in circumstances, the applicant could not have filed a meritorious application, and that the change in circumstances resulted in an application that could succeed.[4] This is not, however, the law of our circuit.

**[4]** Our law does not require that "changed circumstances" constitute an entirely new conflict in an asylum applicant's country of origin, nor does it preclude an individual who has always feared persecution from seeking asylum because the risk of that persecution increases. *See Fakhry v. Mukasey*, 524 F.3d 1057, 1063 (9th Cir. 2008). "[T]here can be 'changed circumstances which materially affect the applicant's eligibility for asylum' even if the alien always meant to apply for asylum and always feared persecution." *Id.* at 1064. An appli-

---

[4]Our dissenting colleague not only shares this view, but asserts that it is what the "plain language of the statute" says. *See* Dissenting Opinion at 4490. The dissent would read "materially affect the applicant's eligibility," 8 U.S.C. § 1158(a)(2)(D), to say "first make the applicant eligible for." "Material," however, does not mean "dispositive." *See* Black's Law Dictionary, Material (8th ed. 2004) ("Having some logical connection with the consequential facts . . . . cf. Relevant"). Instead, a "material" effect on eligibility for asylum is an effect that increases, in a non-trivial way, the applicant's likelihood of success in his application. A worsening of country conditions that substantially increases the chance that asylum will be granted "materially affects the applicant's eligibility" for asylum. Were "eligibility for asylum" a matter of a known quantum of evidence, then the dissent might be correct that the only "material" effect on eligibility is the marginal effect that pushes an applicant over the line from "not eligible" to "eligible." As we illustrate below, *see* Opinion at 4487-88, however, it is virtually impossible to know before filing an asylum application whether an agency adjudicator will find that it contains sufficient evidence to prove that the applicant both is eligible for and deserves asylum. In a system of human, rather than robotic, adjudicators, it would constitute a lack of understanding of the practical working of the legal system to suggest seriously that the change we describe is simply "from 'eligible' to 'still eligible,' " Dissenting Opinion at 4490, rather than from "possibly eligible" to "much more likely eligible."

cant is not required to file for asylum when his claim appears to him to be weak; rather he may wait until circumstances change and the new facts make it substantially more likely that his claim will entitle him to relief. *Id.* In such cases, we may recognize changed circumstances. *Id.*[5]

**[5]** Further, the interpretation of the changed circumstances exception posited by the IJ and the BIA (as well as the dissent) is contrary to the intent of Congress and the purpose of 8 U.S.C. §1158(a)(2)(D). It is true, as the dissent points out, that Congress's paramount objective in enacting the one-year bar was to prevent fraudulent claims. *See* 141 Cong. Rec. E1635 (daily ed. Aug. 3, 1995). However, Congressional one-year bar proponents were equally concerned with ensuring that the United States remain a safe haven for legitimate asylum seekers fleeing persecution in their home countries. In fact, Senator Orrin Hatch, one of the one-year deadline's major proponents, stated that he "share[d] the . . . concern that we continue to ensure that asylum is available for those with legitimate claims for asylum" and that he was 'committed to ensuring that those with legitimate claims for asylum are not returned to persecution, particularly for technical deficiencies." 142 Cong. Rec. S11838-40 (daily ed. Sept. 30, 1996) (statement of Sen. Orrin Hatch).

**[6]** The proposed exceptions to the one year bar for changed circumstances and extraordinary circumstances were

---

[5]It is the dissent, not the opinion of the court, that would create a conflict with Fakhry. *See* Dissenting Opinion at 4492-93. *Fakhry* discussed the relative strength of an asylum application before and after claimed changed circumstances, and did not hold, as the dissent would, that an applicant must prove that his application was previously too weak to be granted and now is strong enough, in an *absolute* sense. *See* 524 F.3d at 1064 (discussing changes that make an "application much stronger"). The language in *Fakhry* cited by the dissent, concerning an applicant with a previously "weak" or "meritless" case for asylum, was by the opinion's own terms merely one hypothetical situation. *See Fakhry*, 524 F.3d at 1063-64.

intended to be broad. In fact, the original Senate version of the filing deadline for asylum applications contained a broad "good cause" exception which was not ultimately included in the final law but instead was converted into the "changed circumstances" and "extraordinary circumstances" exceptions. *See* 142 Cong. Rec. S11839-40. Senator Hatch commented that the new, revised exceptions were broad enough to likely cover that which would have been covered by the good cause exception. *See id.* When asked what the intent was in creating the "changed circumstances exception, Senator Hatch stated that "the exception is intended to deal with circumstances that changed after the applicant entered the United States and that are *relevant* to the applicant's eligibility for asylum. The changed circumstances provision will deal with situations like those in which the situation in the alien's home country may have changed, the applicant obtains more information about likely retribution he or she might face if the applicant returned home." *Id.* (emphasis added).

**[7]** The narrow interpretation of the changed circumstances exception urged by the IJ and BIA (as well as by the dissent) would turn what Congress intended completely on its head. Vahora has a legitimate, non-fraudulent asylum claim. The conditions in his home country have changed greatly, due to increased persecution of Sunni Muslims based on religion and nationality. According to the congressional proponents of the one-year bar and its exceptions, Vahora is precisely the type of asylum applicant they did not want to be returned to persecution in his home country.[6]

---

[6]The dissent's restrictive interpretation of Section 1158(a)(2)(D) also undermines the training manual given to asylum officers by the Department of Homeland Security ("DHS"). The DHS manual provides an example of changed circumstances that is instructive in Vahora's case: "Applicant is a member of XYZ party in his country. He is briefly jailed in September 1999." He arrives in the U.S. in November 1999 and files for asylum in December 2000. On the day of the interview, XYZ members are still routinely being jailed." In such a case, the manual instructs that

**[8]** Prior to the change in country conditions, Vahora may or may not have had a strong enough claim to qualify for asylum within one year of his arrival in the United States. The fact that, on remand from Vahora's first appeal to the BIA, the IJ found that Vahora was eligible for withholding of removal suggests that, based upon the evidence available at that time, an asylum application filed in 2001 might well have been granted. *See Singh v. INS*, 134 F.3d 962, 971 (9th Cir. 1998) (stating that the standard for withholding of deportation is "more stringent" than the showing required for asylum); *see Bolanos-Hernandez v. INS*, 767 F.2d 1277, 1288 (9th Cir. 1984). However, Vahora did not have the luxury of such 20-20 hindsight during the time period his application should ordinarily have been filed.[7] Indeed, whether or not the IJ would have found Vahora to have a well-founded fear of persecution at the time of his arrival in the United States, we know that Vahora did not perceive that he met that standard, because he did *not* fear future persecution, but rather expected to be able to return home when tensions subsided. The desire to wait for an asylum claim to mature is entirely consistent

---

asylum officers should find no changed circumstances but warns that, as in Vahora's case, "if conditions for XYZ members worsened after the applicant departed his country, he may be eligible for the changed circumstances exception." *See* U.S. Dep't of Homeland Sec., Asylum Officer Basic Training Course: One-Year Filing Deadline, 9 (2009) (available at http://www.uscis.gov/files/article/One-Year-Filing-Deadline.pdf).

[7]The dissent, however, does possess such hindsight, which is what enables it to rely on both the fact that the IJ ultimately deemed Vahora's testimony credible and on decisions of this court that post-date Vahora's asylum application by six to eight years to suggest that Vahora should have known his claim was strong enough all along. *See* Dissenting Opinion at 4492-93. The relevant inquiry is instead what Vahora could have known when he decided not to apply for asylum during his first year in the country: that the only evidence he had in his favor was his testimony, which may or may not be believed, that he had been persecuted in the past.

with a reluctance to abandon one's homeland until conditions at home become substantially more dangerous.[8]

Certainly Vahora could not have known that whatever IJ would be assigned to his case would have viewed the evidence in the same manner as the IJ who ultimately found him eligible for withholding of removal. Individual IJs grant asylum applications at wildly different rates from one another, even those who sit in the same location and whose randomly assigned cases reflect the same mix of applicants' countries of origin. *See* Jaya Ramji-Nogales et al. *Refugee Roulette: Disparities in Asylum Adjudication*, 60 STAN. L. REV. 295, 333-39 (2007). For example, among cases such as Vahora's involving Indian asylum applicants, heard in Immigration Court in San Francisco, the average grant rate for all IJs between 2002 and 2004 was 52 percent, but one judge granted asylum in only 3 percent while another granted asylum in 84

---

[8]We therefore do not share the dissent's fear of a horde of "[i]llegal immigrants" who will "now sit on their asylum claims indefinitely, assured that virtually any change in country conditions . . . will excuse their lateness." Dissenting Opinion at 4490. We cannot conceive of a reason why any immigrant who intends to seek asylum and has an asylum claim he believes to be meritorious would withhold filing and wait, in the perverse hope that conditions in his homeland might deteriorate, rather than file his application when he is eligible. An immigrant who intends all along to seek asylum and has a claim that he is confident will succeed would be most unwise to let the clock run past the one-year mark, given the chance that circumstances will *not* significantly worsen and his claim will be permanently barred. Our rule simply provides no incentive for the general behavior the dissent describes.

Further, the reality facing asylum applicants today is that the DHS rejects the vast majority of late-filed asylum applications, finding no applicable exception. *See* Philip G. Schrag, *Rejecting Refugees: Homeland Security's Administration of the One-Year Bar to Asylum*, 52 Wm. & Mary L. Rev. 651, 653 (2010). Since the filing deadline went into effect in 1998, the DHS has rejected more than 15,000 asylum applications, involving more than 21,000 refugees who would very likely have won asylum in this country, if it were not for the filing deadline. *Id.* Our decision today seems unlikely to alter this landscape and open the floodgates, despite the dissent's fears.

percent. *Id.* at 337 fig. 26. The same broad variance in grant rates is reported for asylum officers, the agency staff members who first review asylum applications prior to their referral (when not granted) to IJs. *See id.* at 313-25.

To make out a claim for asylum, an alien who has demonstrated past persecution must nonetheless overcome efforts by the government to prove that his fear of *future* persecution is not well-founded or that he could avoid persecution by relocating internally. *See Deloso v. Ashcroft*, 393 F.3d 858, 863-64 (9th Cir. 2005). Vahora's ability to establish a well-founded fear of persecution was materially affected by the rioting in 2002 and its impact on his family in 2002. *Estrada-Posadas v. INS*, 924 F.2d 916, 918 (9th Cir. 1991) ("A 'well-founded fear' is both subjective and objective in that an alien must have a genuine fear of persecution and provide evidence that would support a reasonable fear of persecution.").

**[9]** Further, this court has viewed ongoing family safety in the country of origin as a relevant factor in assessing a request for asylum. *See Mendez-Efrain v. INS*, 813 F.2d 279 (9th Cir. 1987) (noting that similarly situated members of the petitioner's family continued to reside without incident on the family farm in the alleged zone of danger); *Aruta v. INS*, 80 F.3d 1389, 1395 (9th Cir. 1996); *Estrada v. INS*, 775 F.2d 1018, 1021-22 (9th Cir. 1985) ("The absence of harassment of an alien's family tends to reduce the probability of persecution.").

**[10]** Prior to the rioting that occurred in February and March 2002, Vahora's family remained in India without incident. The ongoing safety of his family could have been viewed by the IJ as mitigating a well-founded fear of persecution, if Vahora had filed an asylum application prior to the disappearance of his brothers. Therefore, the harassment of both of Vahora's brothers by the police, and the arrest and subsequent silence from one and the flight and subsequent silence from the other, materially affected his eligibility for

asylum by making substantially less likely the possibility that his application would be denied on the basis that his family could remain safely in India. Again, applicants should not be required prematurely to take a risk that their applications will be denied.

**[11]** Taking into account the appropriate standard, the disappearance of Vahora's brothers, the destruction of Vahora's home, and the unrest following the destruction of the Swami Narayn temple in September 2002 undoubtedly did "materially affect the applicant's eligibility for asylum" as required by 8 C.F.R. § 208.4(a)(4)(i)(a). The changes in Vahora's circumstances are precisely the kind that, under *Fakhry*, permit an asylum applicant to finally seek asylum, notwithstanding the one-year limitation, once his claim grew substantially stronger. *Fakhry*, 524 F.3d at 1063. We therefore hold that the circumstances shown by Vahora constitute "changed circumstances" justifying the untimely filing of his asylum application; thus we grant his petition for review.

**[12]** The government requests that we remand for the BIA to consider whether Vahora delayed unreasonably after learning of the changed circumstances before filing his asylum application. A delay must be "reasonable under the circumstances." 8 C.F.R. § 1208.4(a)(4)(ii); *see Husyev v. Mukasey*, 528 F.3d 1172, 1182 (9th Cir. 2008) ("[T]he term 'reasonable period' . . . suggests an amount of time that is to be determined on the basis of all the factual circumstances of the case."). Vahora learned of the attacks on his family home and the arrest and disappearance of one brother and the flight into hiding of the other brother in September and October of 2002. He filed for asylum on December 16th. On the basis of Vahora's circumstances, a time period of two months in which to ascertain what had happened to his family property and his brothers, to decide whether to remain in the United States, and to consult with an attorney and prepare an asylum application is eminently reasonable. We therefore remand for

the BIA to consider the merits of Vahora's asylum application in the first instance.

**PETITION GRANTED and REMANDED.**

---

Chief Judge **KOZINSKI**, dissenting:

The majority makes mincemeat of the one-year filing requirement. Illegal immigrants can now sit on their asylum claims indefinitely, assured that virtually any change in country conditions will excuse their lateness. This is contrary to the text and purpose of the statute, and runs roughshod over our precedent.

While a worsening of country conditions can sometimes constitute a "changed circumstance," *see Fakhry* v. *Mukasey*, 524 F.3d 1057 (9th Cir. 2008); *see also* 8 C.F.R. § 208.4(a)(4)(i)(A), this worsening must "materially affect the applicant's eligibility for asylum," 8 U.S.C. § 1158(a)(2)(D). What must be materially altered isn't the country conditions, but the alien's eligibility. Going from "eligible" to "still eligible" is no change at all, much less a material one. Under the plain language of the statute, a petitioner must show that, prior to the changed circumstances, he was ineligible for asylum.

Congress enacted IIRIRA "to expedite the physical removal of those aliens not entitled to admission to the United States." *Coyt* v. *Holder*, 593 F.3d 902, 906 (9th Cir. 2010); *see also Morales-Izquierdo* v. *Gonzales*, 486 F.3d 484, 494 (9th Cir. 2007) (en banc) ("Congress' ambitious purpose behind IIRIRA was to enable the prompt admission of those who are entitled to be admitted, [and] the prompt exclusion or removal of those who are not . . . ." (internal quotation mark omitted)). Congress adopted the one-year limitation period as part of IIRIRA's statutory scheme because it found that "[t]he

asylum system has been abused by those who seek to use it as a means of 'backdoor' immigration." H.R. Rep. No. 104-469, pt. 1, at 107 (1996). As the Second Circuit observed, "Congress intended the one-year deadline to prevent persons who had resided in the United States for an extended period of time from applying for asylum as an afterthought, after overstaying their visas or failing to obtain citizenship through another means." *Joaquin-Porras* v. *Gonzales*, 435 F.3d 172, 180 (2d Cir. 2006) (citing H.R. Rep. No. 104-469, pt. 1, at 116). Finding a "changed circumstance" exception whenever a new development is "non-trivial," maj. op. at 4483 n.4, "undermine[s] the one-year deadline's clear purpose of focusing the asylum process on those who have recently fled persecution in their home countries," *Joaquin-Porras*, 435 F.3d at 180.

The majority argues that Congress intended the exceptions to the one-year deadline to be broad by virtue of the fact that it expressly rejected an expansive "good cause" exception in favor of the significantly more limited "changed circumstances" exception. Maj. op. at 4484-85. *But see Luciana* v. *Att'y Gen. of the U.S.*, 502 F.3d 273, 277 (3d Cir. 2007) (describing the exceptions as "narrow"). Such reasoning not only defies logic, but ignores the Supreme Court's instruction that when "construing provisions . . . in which a general statement of policy is qualified by an exception, [we] read the exception narrowly in order to preserve the primary operation of the provision." *Knight* v. *Comm'r*, 552 U.S. 181, 190 (2008) (omission in original) (quoting *Comm'r* v. *Clark*, 489 U.S. 726, 739 (1989)) (internal quotation mark omitted). Reading the "changed circumstances" exception narrowly is necessary not just to preserve the primary operation of the one-year filing deadline, but to keep the exception from swallowing it whole.

Requiring a petitioner to show that he was previously ineligible for asylum dovetails with our interpretation of the statute's parallel exception for "extraordinary circumstances." 8

U.S.C. § 1158(a)(2)(D); *cf. Husyev* v. *Mukasey*, 528 F.3d 1172, 1180 (9th Cir. 2008) (looking to case law interpreting the "parallel issue" of "changed circumstances" to interpret the "extraordinary circumstances" provision). We recently interpreted this exception to require a petitioner to show that extraordinary circumstances "prevented him from timely filing an asylum application." *Toj-Culpatan* v. *Holder*, 612 F.3d 1088, 1091 (9th Cir. 2010) (per curiam). It is similarly reasonable to infer that Congress meant the "changed circumstances" exception to apply only where, prior to the change, petitioner could not file for asylum because he was ineligible. Although the exceptions are different—extraordinary circumstances must "directly relate[ ] to the failure to meet the 1-year deadline," while changed circumstances must "materially affect the applicant's eligibility for asylum," 8 C.F.R. § 208.4(a)(4)-(5)—both are limited exceptions for situations where an applicant couldn't file earlier, because he was prevented by extraordinary circumstance or prevented by his inability to meet all the requirements for asylum.

*Fakhry* v. *Mukasey*, 524 F.3d 1057 (9th Cir. 2008), adopts precisely this approach to "changed circumstances." *Fakhry* holds that, because asylum requires "both subjectively genuine and objectively reasonable" fear of persecution, a petitioner may be able to show changed circumstances based on a worsening of country conditions (the objective prong), even when he always feared persecution (the subjective prong). *Fakhry*, 524 F.3d at 1063 (quoting *Al-Harbi* v. *INS*, 242 F.3d 882, 888 (9th Cir. 2001)) (internal quotation marks omitted). We allowed Fakhry's claim to go forward because "a likely purpose of the exception [is] to excuse late applications when an alien previously had *a weak or nonexistent* case for asylum." *Id.* (emphasis added). "Why," we asked, "should [an applicant] be penalized for declining to clog the immigration courts with a *meritless* application?" *Id.* at 1064 (emphasis added). The majority creates a square conflict with *Fakhry*: Where, as here, the asylum-seeker has a meritorious asylum

claim from day one, the exception must give way to the overriding purpose of the deadline discussed above.

Vahora can't argue he couldn't file within a year of his arrival in the United States because he didn't have a meritorious asylum claim; his claim was quite strong from day one. He credibly testified that after a meeting was held at his home to discuss the destruction of the local mosque by Hindu youths, "the[ police] took [him] to Mahla police station and they put [him] in a room. They started beating [him] as well as calling [him] names using bad language. And they were alleging that [he] was a Muslim and creating disturbance in the area of Hindus." Vahora also testified about another time he was arrested, when the police detained him for fifteen days and "beat [him] once or twice every day, every time, and [he] was beaten from 25 to 30 times . . . . saying that [he] was a traitor against the national interest and wanted some kind of disturbance in their Hindu areas." He testified that "[t]he police would beat [him] with the leather belts and batons. They would beat [him] with the hands as well as the boots. The police would hold [him] by [his] hair and strike [his] head against the wall." This evidence of past religious persecution, if believed, would be more than enough to meet the requirements for asylum. *See, e.g.*, *Zhao* v. *Mukasey*, 540 F.3d 1027, 1028, 1031 (9th Cir. 2008) (petitioners credibly testified police officer beat them for religious practices); *see also, e.g.*, *Kamalyan* v. *Holder*, No. 05-76408, 2010 WL 3325840, at *1-2 (9th Cir. Aug. 25, 2010) (petitioner credibly testified police detained and beat him for being a Jehovah's Witness); *Li* v. *Holder*, 559 F.3d 1096, 1107-08 (9th Cir. 2009) (petitioner credibly testified police beat him once and detained him at a labor camp for fifteen days, where he was beaten by fellow detainees). The majority doesn't disagree.

Given the clear evidence of religious persecution that Vahora suffered before he left India, any deterioration of country conditions couldn't have affected his already strong claim for asylum. In Vahora's case, we need not even specu-

late: We *know* he would have been granted asylum because the IJ relied exclusively on events before Vahora fled India to grant him relief under the more stringent standard for withholding of removal. *See Singh* v. *INS*, 134 F.3d 962, 971 (9th Cir. 1998). Without an effect on his eligibility, there can be no changed circumstances, regardless of how much country conditions may have deteriorated.

But what if Vahora had applied for asylum as soon as he arrived and was denied relief? If country conditions subsequently worsened, he would in no way be punished for his diligence in filing his initial claim. *See Malty* v. *Ashcroft*, 381 F.3d 942, 945 (9th Cir. 2004). The regulations expressly contemplate that an asylum seeker's case might improve after his first application is rejected: 8 C.F.R. § 1003.2(c)(3)(ii) allows aliens to "reapply for asylum or withholding of deportation based on changed circumstances arising in the country of nationality." Such applicants are exempted from the time limits that normally apply to motions to reopen, meaning that they're free to reapply for asylum whenever they believe they have a stronger claim. *See id.* § 1003.2(c)(3). The regulatory scheme anticipates that some asylum applicants may have borderline cases at the start, and expresses a preference that they timely announce their presence in the United States by filing an asylum application within a year of entry—with the possibility of reopening their case if it later becomes stronger —rather than hiding in the weeds until they feel like applying.

Country conditions change constantly, often going from bad to worse. Letting asylum applicants decide when things are bad enough to warrant an asylum application undermines Congress's effort to make asylum applicants present their claims promptly. Allowing a petitioner who has a strong claim to wait until his claim gets even stronger renders the one-year limit imposed by Congress meaningless. The only way to give effect to the statutory scheme is to require a petitioner who has a plausible claim for asylum to present it within one year of entering the United States or within a rea-

sonable time after he develops such a claim, if this happens after the one-year period has elapsed.

The majority's mischief reveals the larger problem with reviewing the BIA's determination at all. *See Ramadan* v. *Keisler*, 504 F.3d 973 (9th Cir. 2007) (O'Scannlain, J., dissenting from denial of rehearing en banc). Every other circuit to have addressed the issue—ten in all—has found that we lack jurisdiction to review the "changed circumstances" exception because it is a "discretionary [decision] committed to the Executive Branch." *Jarbough* v. *Att'y Gen. of the United States*, 483 F.3d 184, 190 (3d Cir. 2007). In the immigration context, the need for national uniformity is paramount so that the BIA can bring its expertise to bear on these difficult and fact-intensive issues, *see Kaganovich* v. *Gonzalez*, 470 F.3d 894, 897-98 (9th Cir. 2006), and to avoid forum-shopping "by those who seek to use [asylum] as a means of 'backdoor' immigration," H.R. Rep. No. 104-469, pt. 1, at 107. Yet, in three short years, we have gutted the statutory mandate so that changed circumstances need be demonstrated not "to the satisfaction of the Attorney General," 8 U.S.C. § 1158(a)(2)(D), but to the satisfaction of two judges on an appellate panel. This usurpation of executive power directly contravenes the Real ID Act, and the majority's sweeping expansion of the changed circumstances exception reveals just why we should never have started down this path to begin with. We were wrong in failing to take *Ramadan* en banc. Fortunately, we will now have an opportunity to correct that error.

* * *

With one swift blow, the majority pretty much knocks out the one-year filing deadline for asylum claims, showing once again that no statute, no matter how clear, is safe from usurpation by judges willing to engage in creative interpretation. It's a tired game, and I'll have no part in it.