**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| NISHCHAL BHATTARAI, *Petitioner*, v. LORETTA E. LYNCH, Attorney General, *Respondent*. | No. 12-74062 Agency No. A201-044-890 OPINION |

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted March 7, 2016
Pasadena, California

Filed August 30, 2016

Before: William A. Fletcher, Mary H. Murguia,
and John B. Owens, Circuit Judges.

Opinion by Judge W. Fletcher

## SUMMARY[*]

### Immigration

The panel granted a petition for review of the Board of Immigration Appeals' denial of asylum, withholding of removal, and Convention Against Torture relief on adverse credibility grounds.

The panel held that the alleged inconsistencies the immigration judge identified were unsupported by the record or more properly deemed gaps in corroborative evidence, and that the immigration judge erred by failing to give petitioner notice and an opportunity to explain any perceived inconsistencies or provide additional corroborative evidence.

### COUNSEL

Garish Sarin (argued), Law Offices of Garish Sarin, Los Angeles, California, for Petitioner.

Richard Zanfardino (argued), Trial Attorney; Terri J. Scadron, Assistant Director; Office of Immigration Litigation, Civil Division, United States Department of Justice, Washington, D.C., for Respondent.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

**OPINION**

W. FLETCHER, Circuit Judge:

Nishchal Bhattarai petitions for review of the Board of Immigration Appeals' ("BIA") denial of his application for asylum, withholding of removal, and relief under the Convention Against Torture ("CAT"). The BIA upheld the immigration judge's ("IJ") adverse credibility finding based on alleged inconsistencies between Bhattarai's testimony and certain supporting documents, and because Bhattarai failed to provide additional corroborative evidence, including testimony by his brother. The alleged inconsistencies are either unsupported by the record or are more properly considered gaps in corroboration, and the IJ failed to give Bhattarai notice and an opportunity to provide the corroborative evidence she deemed necessary. *See Ren v. Holder*, 648 F.3d 1079, 1090–92 (9th Cir. 2011). We therefore grant the petition and remand for further proceedings.

## I. Background

### A. Bhattarai's Asylum Application and Testimony

The following narrative was set forth in Bhattarai's asylum application and testimony before the IJ.

Petitioner Nishchal Bhattarai is a 33-year-old native of Nepal, born to a politically active family who "influenced [him] with the democratic ideology since [his] school life." In 1999, Bhattarai joined the Nepal Student Union ("NSU"), and later its parent political party, the Nepali Congress Party ("NCP"). Bhattarai worked on student elections for the NSU

and from 2001 to 2002 served as an NCP district chief in his home Sunsari district.

During the time he was involved with the NSU and NCP, Bhattarai was attacked three times by individuals identified with the Maoist Party, which opposed the NCP. The first attack occurred on June 6, 2002. Just after Bhattarai had returned home from the NCP offices, a group of five Maoists arrived at his home. The Maoists accused Bhattarai of "[g]oing against" the Maoist Party, and demanded money. When Bhattarai told the Maoists that he would not help them, they beat him with sticks, a cane, and bicycle chains on his back and buttocks. They told Bhattarai before leaving that if he continued his involvement with the NCP they would return to hurt him again. Two days after the attack, Bhattarai fled to Kathmandu—several hundred kilometers from the Sunsari district—where he moved in with friends. The Maoists continued to communicate threats to Bhattarai through friends and family.

The second attack occurred almost six years later, on March 29, 2008. By this time, Bhattarai had completed a bachelor's degree and had begun studies for a master's degree in Kathmandu. He was still active with the NSU and gave speeches advocating the end of monarchy in Nepal. In 2008, in anticipation of national elections in April of that year, Bhattarai returned to Sunsari, his home district, to campaign for the NCP. During a campaign program on March 29, members of the Young Communist League ("YCL")—a branch of the Maoist Party—began throwing rocks. A group of Maoists then captured a number of NCP workers, including Bhattarai, and beat Bhattarai with a cane. They forbade him from voting for the NCP, and threatened to "cut [him] into pieces" if he returned to the area to promote the

NCP. The next day, Bhattarai returned to Kathmandu, where his brother was then living and studying. Bhattarai continued his political activities on behalf of the NCP.

Bhattarai's third and most serious confrontation with Maoists occurred two years later, in March 2010. Bhattarai had begun working as a program officer for the organization UNESCO and Youth Nepal ("UNESCO-YN") in 2008. He worked primarily as a youth leader, raising awareness about HIV, drug addiction, human rights, and community development. On March 8, 2010, Bhattarai was participating in a four-day youth program he had organized in a rural district, when he received a phone call from Maoists demanding that he leave the area. Bhattarai informed the president of UNESCO-YN and other local leaders about the threat. The next day, March 9, Bhattarai had just completed a lecture when three individuals who identified themselves as Maoists entered the room and confronted him. One drew a pistol and told Bhattarai to be silent while another rummaged through his bag and seized paperwork and 10,000 rupees (approximately $130). The Maoists then forced Bhattarai to walk for half an hour to a small isolated hut, and tied Bhattarai's hands behind his back with a rope.

Four additional Maoists were waiting at the hut. One introduced himself as "Taurav." He said that Bhattarai had been warned not to organize "this kind of program[]," particularly in Maoist occupied areas. Taurav then punched Bhattarai in the face, and the other Maoists began beating him with sticks. They told Bhattarai that he was "going against their party," accused him of being a spy for another party, and demanded that Bhattarai leave the NCP, quit his job with UNESCO-YN, and publicly join the Maoist Party. When Bhattarai refused, his captors hit and kicked him in the head

and body until his vision became blurry. Bhattarai felt "excruciating pain" in his head and right arm. He heard the Maoists say that they were "going to have to end him," and then he blacked out.

Bhattarai awoke in a police station. He learned later that villagers had found him lying on the floor of the hut and had contacted the police. The police gave Bhattarai first aid. The next day, March 10, Bhattarai returned to Kathmandu to receive medical treatment. He had pain "almost all around [his] body" and his right elbow was sprained. The doctor treated him for one week, prescribed medicine, and asked him to rest for three weeks. He recovered while living at a house he rented in Bhaktapur, near Kathmandu.

Several months later, Bhattarai was invited to participate in a UNESCO Youth Assembly at UN Headquarters in New York City. He was issued a non-immigrant visa and entered the United States on August 2, 2010. While he was in the United States, his parents received threats from the Maoists and told him not to return to Nepal. Bhattarai heeded their warnings. He remained in the country and lived with his brother, who had won the diversity visa lottery and had moved to the United States in 2009.

## B. Procedural History

On February 1, 2011, the day his visa expired, Bhattarai filed an affirmative application for asylum, withholding of removal, and protection under the CAT. He included a number of supporting documents, including a sworn declaration, medical notes from the doctor who treated his injuries in 2010, a letter from a Nepali police investigator, other supporting letters from the NSU, NCP, and UNESCO-

YN, among others, and a 2010 U.S. State Department country conditions report.

The Department of Homeland Security filed a Notice to Appear, and Bhattarai appeared in Immigration Court for a merits hearing on July 18, 2011. At the hearing, Bhattarai testified and was cross-examined. The IJ concluded the hearing by stating that "the evidentiary record's closed." About two weeks later, on August 3, 2011, the IJ denied Bhattarai's application. She found that he had not "presented credible evidence" of past persecution or fear of persecution. In particular, the IJ found Bhattarai's supporting documentation "at odds with" his testimony and lacking in specifics. She also stated that Bhattarai's brother's absence from the hearing "severely undercut[] [his] credibility."

Bhattarai appealed to the BIA. Bhattarai also submitted a motion to remand for consideration of additional evidence, including additional letters from the NCP and UNESCO-YN, as well as a copy of Bhattarai's brother's passport. The BIA denied Bhattarai's appeal and motion to remand on December 5, 2012. The BIA found no clear error in the IJ's adverse credibility finding, and refused to remand for consideration of the additional evidence, on the ground that it had been available and could have been presented at the time of Bhattarai's hearing before the IJ.

Bhattarai filed a timely petition for review with this court.

## II. Standard of Review

Where, as here, the BIA agrees with and incorporates specific findings of the IJ while adding its own reasoning, we review both decisions. *Vahora v. Holder*, 641 F.3d 1038,

1042 (9th Cir. 2011). "We review factual findings, including adverse credibility determinations, for substantial evidence." *Garcia v. Holder*, 749 F.3d 785, 789 (9th Cir. 2014). We will uphold the finding "unless any reasonable adjudicator would be compelled to conclude to the contrary." *Id.* (quoting 8 U.S.C. § 1252(b)(4)(B)). We review questions of law de novo. *Id.*

## III. Discussion

### A. Asylum and Withholding of Removal

An applicant for asylum and withholding of removal bears the burden of establishing eligibility. 8 U.S.C. §§ 1158(b)(1)(B)(i), 1229a(c)(4)(A). Under the REAL ID Act, which applies to applications filed after May 11, 2005, an applicant may establish eligibility on his credible testimony alone, without any corroboration. 8 U.S.C. § 1158(b)(1)(B)(ii). However, "[w]here the trier of fact determines that the applicant should provide evidence that corroborates otherwise credible testimony, such evidence must be provided unless the applicant does not have the evidence and cannot reasonably obtain the evidence." *Id.*

In *Ren v. Holder*, we held that this provision requires an IJ to "provide an applicant with notice and an opportunity to either produce [corroborative] evidence or explain why it is unavailable before ruling that the applicant has failed in his obligation to provide corroborative evidence." 648 F.3d at 1090. Our conclusion was based on a detailed textual analysis of § 1158(b)(1)(B)(ii) and supported by the constitutional avoidance canon, because requiring an applicant to provide corroborative evidence before he knew it was necessary

would "raise . . . due process concerns." *Id.* at 1093. We laid out a "sequential analysis" that an IJ must undertake:

> To begin, the IJ must determine whether an applicant's credible testimony alone meets the applicant's burden of proof. If it does, no corroborative evidence is necessary. If a credible applicant has not yet met his burden of proof, then the IJ may require corroborative evidence. If corroboration is needed, however, the IJ must give the applicant notice of the corroboration that is required and an opportunity either to produce the requisite corroborative evidence or to explain why that evidence is not reasonably available.

*Id.*

*Ren* makes clear that an IJ cannot articulate for the first time in her decision denying relief that key corroborative evidence is missing. Rather, when an IJ determines that additional corroborative evidence should have been submitted, the IJ must give an applicant notice of what evidence would suffice and an opportunity to provide the evidence or explain why he cannot reasonably obtain it. If the IJ or BIA failed to provide the required notice and opportunity, we must grant the petition and remand. *See Lai v. Holder*, 773 F.3d 966, 975–76 (9th Cir. 2014) (granting petition based on *Ren*); *Zhi v. Holder*, 751 F.3d 1088, 1094–95 (9th Cir. 2014) (same).

The notice-and-opportunity requirement applies when the applicant's testimony is "otherwise credible." *Ren*, 648 F.3d at 1090. The REAL ID Act sets out a non-exhaustive list of

factors that may reflect on the credibility of an applicant's testimony or statement, including the "demeanor, candor, or responsiveness" of an applicant; "inherent plausibility" of the applicant's account; consistency between the applicant's written and oral statements, within such statements, or between such statements and other evidence; any inaccuracies or falsehoods in an applicant's statements; "or any other relevant factor." 8 U.S.C. § 1158(b)(1)(B)(iii). Our case law puts some limits on these factors. For example, we require that the inconsistencies that form the basis of the IJ's adverse credibility determination are not "trivial" and are actually inconsistent in light of all "relevant record evidence." *Shrestha v. Holder*, 590 F.3d 1034, 1043–44 (9th Cir. 2010).

Sometimes immigration judges or the BIA rely on lack of corroboration as a reason for finding an applicant's testimony not credible, but this does not eviscerate *Ren*'s notice-and-opportunity requirement. Rather, when the IJ or BIA "relied on the lack of corroboration as part of [an] overall credibility determination[,] and, on review, we reject[] each of the IJ's other reasons—besides lack of corroboration—for the adverse credibility finding," the denial of relief cannot stand unless the IJ satisfied *Ren*'s requirements. *Lai*, 773 F.3d at 976 (internal quotation marks omitted). To apply *Ren* in this situation, we must disentangle the IJ's corroboration-related reasons for the adverse credibility determination from other reasons, such as inconsistencies, implausibility, or demeanor.

In reviewing an adverse credibility determination in which lack of corroboration is one of several stated grounds for the IJ or BIA's decision, we undertake a two-step process. First, we separate out the non-corroboration grounds for the adverse credibility determination and evaluate whether the IJ and BIA's determination is supported by substantial evidence.

If it is, we defer to the IJ and BIA's adverse credibility determination. But if we overturn that determination, and only issues regarding lack of corroboration remain, we next ask whether the IJ satisfied *Ren*'s notice requirement. If the IJ did not provide the applicant notice of the specific corroborative evidence that was required and an opportunity to provide it or explain why he cannot reasonably obtain it, we remand for the IJ to give the applicant that opportunity. *See Lai*, 773 F.3d at 974–75; *Zhi*, 751 F.3d at 1095. We now apply that method to this case.

## 1. Credibility

The BIA upheld the IJ's adverse credibility determination based on one purported internal inconsistency in Bhattarai's testimony, and on three purported conflicts between Bhattarai's testimony and other evidence in the record. We find that some of the purported inconsistencies and conflicts are not supported by substantial evidence or were not properly addressed by the IJ at the hearing while others are more properly categorized as lack of corroboration.

### a. Bhattarai's Home in Kathmandu

The BIA found Bhattarai's testimony internally inconsistent because he first testified that "he stayed with friends when he fled to Kathmandu," and later testified that he stayed at a home his parents had in Kathmandu. Even if we assume, *arguendo*, that this detail is non-trivial, *see Shrestha*, 590 F.3d at 1043 (stating that "trivial" inconsistencies may not support an adverse credibility determination), the record reveals no actual inconsistency. Bhattarai's first statement was in response to a question about where he stayed when he fled from Sunsari to Kathmandu

after suffering his first Maoist attack in June 2002. He replied that he "stayed with [his] friends." Bhattarai's second statement was in response to the IJ's question about where he stayed "after [his] release from the hospital" following the attack in March 2010. Bhattarai replied that he returned to a house "we had rented" in Bhaktapur, a suburb of Kathmandu. He added that his parents "used to come every [so] often" to stay there and were there with him when he returned from the hospital. He never said that the house belonged to his parents.

The fact that Bhattarai stayed with friends during his first days in Kathmandu in 2002 but by 2010 had a rented home in a Kathmandu suburb is not only internally consistent but also eminently believable. It stands to reason that after living, studying, and working in the capital for eight years Bhattarai would have established a more stable residence. Indeed, Bhattarai explained this to the IJ, saying that "in the beginning, for a couple months" he stayed elsewhere, but "later on" he "made the house" in Bhaktapur. The BIA's determination that these two facts were inconsistent ignores the clear meaning of Bhattarai's testimony and has no basis in the record.

### b. Medical "Letter"

The BIA and IJ also found that a medical "letter" submitted by Bhattarai was "at odds with the respondent's testimony and his written application." The IJ stated that Bhattarai testified about Maoists hitting him on the head and beating him until he was unconscious, but that he did not mention an injury to his elbow. In contrast, the medical document omitted any mention of a head injury, focused on treatment of a deep wound to Bhattarai's right elbow, and

stated in the "history" section that Bhattarai "Fell down on the road before ½ hours."

To begin with, we agree with Bhattarai that the IJ mischaracterized this document. The IJ called the document a "report" or "letter," when in reality the document contains only contemporaneous hand-written doctor's notes. The difference is important because the notes are not self-explanatory, as a letter or report would be. Further, the IJ's interpretation of the notes is unsupported by the record. For example, the IJ interpreted the doctor's notation "no unconscious" to mean that Bhattarai had never lost consciousness, but this note appears next to other contemporaneous conditions, such as Bhattarai's vital signs, suggesting that Bhattarai was not unconscious *at the time of the medical exam*. Additionally, the IJ ignored that Bhattarai did in fact specify in his declaration that he felt "excruciating pain" in his right arm during the attack. And the lack of notation regarding a head injury is not an inconsistency. Bhattarai never testified that he had a lingering head injury, and the doctor—who saw him the day after the attack—was likely focused on treating the deep gash at his elbow. Because the IJ did not consider "all plausible and reasonable explanations" for the alleged inconsistencies, substantial evidence does not support the conclusion that the medical notes were inconsistent with Bhattarai's claimed injuries. *See Zhi*, 751 F.3d at 1093.

To the extent the doctor's notation that Bhattarai "Fell down on the road" described a different cause of the injuries than Bhattarai alleged, the IJ never asked Bhattarai about this discrepancy or gave him the opportunity to explain it. An IJ "must provide a petitioner with a reasonable opportunity to offer an explanation of any perceived inconsistencies that

form the basis of a denial of asylum." *Don v. Gonzales*, 476 F.3d 738, 741 (9th Cir. 2007) (quoting *Ordonez v. INS*, 345 F.3d 777, 786 (9th Cir. 2003)). Because Bhattarai was not given this opportunity, the perceived inconsistency is not a proper basis for an adverse credibility determination. *See Soto-Olarte v. Holder*, 555 F.3d 1089, 1091–92 (9th Cir. 2009).

### c. Police Report

The BIA and IJ also found that a "police report" submitted by Bhattarai undermined his credibility because it was "not contemporaneous with the incident" and "omit[ted] any abduction or being threatened with the pistol or the gun." However, the BIA mischaracterized this document. What it termed a "police report" is actually a letter from a police inspector verifying that Bhattarai was the victim of an attack on March 9, 2010. As the letter was presumably written at Bhattarai's request, in order to provide documentation of the attack for the immigration court, it is to be expected that the letter would post-date Bhattarai's decision to apply for asylum.

Moreover, the document is not inconsistent with Bhattarai's testimony or any other record evidence. Rather, it simply does not provide details of Bhattarai's assault. Thus, although the IJ termed this an "inconsistency," the problem with the police letter—to the degree that there is a problem—is that it does not corroborate the details of the assault. As we explained above, when an adverse credibility finding is based on the failure to sufficiently corroborate an applicant's story, *Ren* applies. Thus, if the IJ found it necessary for Bhattarai to present a contemporaneous police report or a report that detailed his assault as corroboration,

she had to provide Bhattarai with notice and an opportunity to provide the report or explain why it is not reasonably available. *See Ren*, 648 F.3d at 1090; *cf. Chawla v. Holder*, 599 F.3d 998, 1002–03 (9th Cir. 2010) (rejecting IJ's adverse credibility determination based on a newspaper article's omission of particular details because applicant could not have been expected to explain the omission before knowing that the IJ would find the evidence lacking). As we explain in the following section on corroboration, the IJ did not do so.

### d. Supporting Letters

Finally, the IJ and BIA also found flaws with the supporting letters Bhattarai submitted from UNESCO-YN, NSU, and NCP. The BIA explained that the letters were dated after Bhattarai's arrival in the United States, "make vague references to each organization's record of the respondent's receiving threats or being tortured, assaulted, or threatened," and provide "no dates or details that would support the respondent's claim."

Again, the lack of details in these supporting documents is not an inconsistency. Rather, the problem is simply that the documents may not sufficiently corroborate the important details of Bhattarai's story. Because *Ren*'s requirements apply to this determination, this purported deficiency is properly addressed in the corroboration analysis below.

In sum, we hold that the inconsistencies identified by the IJ and BIA were either non-existent or procedurally defective because Bhattarai was not given the chance to explain them. We note also that Bhattarai's in-court testimony was remarkably detailed, consistent with his written declaration, and plausible in light of the U.S. State Department report and

other country conditions evidence in the record. "[C]onsidering the totality of the circumstances and all relevant factors," we find that the adverse credibility determination is not supported by substantial evidence. *Owino v. Holder*, 771 F.3d 527, 538 (9th Cir. 2014) (citing 8 U.S.C. § 1158(b)(1)(B)(iii)).

### 2. Corroboration

Because the BIA and IJ's non-corroboration reasons for the adverse credibility determination fail, we consider Bhattarai "otherwise credible" and proceed to determine whether Bhattarai's application was properly denied on the basis that he did not provide certain corroborative evidence. *See Lai*, 773 F.3d at 976.

#### a. Bhattarai's Brother

The IJ focused on the fact that Bhattarai's brother, with whom he lived in the United States, did not testify, commenting that this absence "severely undercut[] [Bhattarai's] credibility." We agree that substantial evidence supports the IJ's determination that Bhattarai's brother "might have corroborated" his testimony. Bhattarai's brother lived in Nepal when Maoists attacked Bhattarai in 2002 and 2008, and could potentially verify Bhattarai's involvement in the NCP. He may also have heard from Bhattarai or his parents about the threats they received from Maoists after Bhattarai moved to the United States and was living with him.

However, the BIA's reliance on the absence of testimony from Bhattarai's brother was error under *Ren* because the IJ did not give Bhattarai notice and an opportunity to present the

corroborative testimony before denying his asylum application. *See Ren*, 648 F.3d at 1091. The government argues that Bhattarai was on notice of the need for his brother's testimony. It points out that the government attorney questioned Bhattarai during the hearing about why his brother hadn't appeared to testify, and that the IJ overruled Bhattarai's counsel's objection by saying that this line of questions "went to credibility." However, even if this was enough to alert Bhattarai that his brother's absence was fatal to his claim—which we are not sure it was—the IJ did not give Bhattarai an opportunity to provide his brother's testimony after her determination that it was necessary. *See id.* (if an IJ determines that corroboration is required, "the applicant *must then* have an opportunity to provide it . . . .") (emphasis added). Instead, at the end of the merits hearing in July 2011, the IJ ordered the evidentiary record "closed." Thus, by the time he knew he should have brought his brother to the hearing, Bhattarai was out of luck. Because the IJ did not give him an opportunity to provide his brother's testimony or explain why he could not, the absence of this corroborative evidence cannot be the basis for denying him relief. *See Zhi*, 751 F.3d at 1095; *see also Chen v. Ashcroft*, 362 F.3d 611, 620 (9th Cir. 2004) ("[W]e have held that due process requires that an applicant be given a second opportunity to establish eligibility for asylum where the adverse credibility determination was based, without notice to the applicant, on a failure to produce a relative as a corroborating witness.").

### b. Supporting Letters

We now return to whether the absence from the supporting letters of specific dates and details of the Maoist attacks is a sufficient ground to deny relief. Even if evidence

corroborating these dates and details was reasonably required to sustain Bhattarai's burden of proof, the IJ erred under *Ren*. The IJ never mentioned the inadequacy of the supporting letters Bhattarai submitted, or suggested a need for more specific documents corroborating dates and details, until she announced her decision. Thus, Bhattarai could not "act on the IJ's determination that he 'should provide' corroboration" because he was "not given notice of that determination until it [wa]s too late to do so." *Ren*, 648 F.3d at 1091.

Bhattarai's attempt to supplement the record with more detailed letters perfectly illustrates the importance of the *Ren* rule. After the IJ issued her decision stating that the supporting letters in the record were too vague and did not contain specific dates, Bhattarai was able to obtain new letters from the NCP and UNESCO-YN verifying the specific attacks he suffered on particular dates. But the BIA refused to reopen his case to consider the new evidence because, in its view, Bhattarai could have obtained this evidence at the time of the previous hearing. Bhattarai thus found himself in an impossible situation: he did not know until after the hearing that certain evidence was required, but once he knew he could not submit it because, in the view of the BIA, that evidence had been available at the time of the hearing.

Because the REAL ID Act requires notice and a fair opportunity to provide the necessary corroborative evidence or explain why it is not reasonably available, we remand for the BIA to provide Bhattarai with that opportunity.

## B. CAT

The IJ and BIA also summarily denied Bhattarai's application for relief under the CAT. To the extent this denial

was based on the flawed adverse credibility determination regarding Bhattarai's asylum and withholding claims, the CAT denial must also be reconsidered on remand.

We note that an adverse credibility determination in the asylum context does not necessarily support denial of an applicant's CAT claim. *See Kamalthas v. INS*, 251 F.3d 1279, 1284 (9th Cir. 2001) ("[W]e are not comfortable with allowing a negative credibility determination in the asylum context to wash over the torture claim . . . ." (internal citation and quotation marks omitted)). Rather, in the CAT context the BIA *must* consider "all evidence relevant to the possibility of future torture," including country conditions evidence. *See id.* at 1282 (quoting 8 C.F.R. § 208.16(c)(3)); *Madrigal v. Holder*, 716 F.3d 499, 508 (9th Cir. 2013) ("Under CAT's implementing regulations, the BIA must consider all evidence of country conditions to determine the likelihood that an applicant would be tortured.").

## Conclusion

The IJ and BIA's adverse credibility determination is not supported by substantial evidence. The IJ and BIA erred in relying on the absence of certain corroborating evidence without giving Bhattarai notice and an opportunity to provide that evidence or explain why he cannot reasonably obtain it. We **GRANT** the petition and **REMAND** for further proceedings consistent with this opinion.