NOT FOR PUBLICATION

FILED

UNITED STATES COURT OF APPEALS

MAY 12 2022

FOR THE NINTH CIRCUIT

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

MAHESH BUDHATHOKI,

       Petitioner,

  v.

MERRICK B. GARLAND, Attorney
General,

       Respondent.

No.   16-70115

Agency No. A201-190-044

MEMORANDUM[*]

On Petition for Review of an Order of the
Board of Immigration Appeals

Submitted May 9, 2022[**]
Pasadena, California

Before: McKEOWN and OWENS, Circuit Judges, and HELLERSTEIN,[***]
District Judge.

Mahesh Budhathoki, a native and citizen of Nepal, petitions for review of

the Board of Immigration Appeals' ("BIA") decision dismissing his appeal of the

---

[*]     This disposition is not appropriate for publication and is not precedent
except as provided by Ninth Circuit Rule 36-3.

[**]    The panel unanimously concludes this case is suitable for decision
without oral argument. *See* Fed. R. App. P. 34(a)(2).

[***]   The Honorable Alvin K. Hellerstein, United States District Judge for
the Southern District of New York, sitting by designation.

immigration judge's ("IJ") decision denying his applications for asylum and withholding of removal. "Where, as here, the BIA agrees with and incorporates specific findings of the IJ while adding its own reasoning, we review both decisions." *Bhattarai v. Lynch*, 835 F.3d 1037, 1042 (9th Cir. 2016). We review factual findings for substantial evidence. *Id.* "Our review is limited to those grounds explicitly relied upon by the BIA." *Romero v. Garland*, 7 F.4th 838, 840 (9th Cir. 2021) (per curiam) (citation omitted). As the parties are familiar with the facts, we do not recount them here. We grant the petition for review and remand for further proceedings.

Budhathoki alleged that he was a member of the Nepali Congress Party, and that he was harmed on account of his political opinion by members of the Maoists and the Young Communist League ("YCL"). Budhathoki testified that he experienced two main incidents with members of the Maoists or the YCL. First, in June 2006, Budhathoki was beaten by Maoists in the jungle until he became unconscious. Second, in April 2008, on election day, YCL members threatened to kill Budhathoki and put a gun to his head at a tea shop, but fled when police officers entered the shop. Budhathoki testified that he did not report either incident to government authorities because he believed that they would not be of any assistance.

The BIA agreed with the IJ that, even if Budhathoki was credible, he failed

to establish past persecution. The BIA rested this determination on the sole ground that Budhathoki failed to show that the past harm he suffered was inflicted by either the Nepalese government or any group or individuals that the government was unable or unwilling to control.[1] *See Bringas-Rodriguez v. Sessions*, 850 F.3d 1051, 1062 (9th Cir. 2017) (en banc) (setting forth requirements to show past persecution, including that "the persecution was committed by the government, or by forces that the government was unable or unwilling to control" (citation omitted)).

We have "long held that a victim of abuse need not report it to government authorities to establish the government's inability or unwillingness to protect him." *Id.* at 1064. Rather, "[w]hether a victim has reported or attempted to report violence or abuse to the authorities is a factor that may be considered, as is credible

---

[1] For this reason, we do not address the issues of Budhathoki's credibility or whether his past harms rose to the level of persecution. *See Romero*, 7 F.4th at 840. In addition, we note that the BIA stated that Budhathoki did "not contest this finding on appeal" regarding whether his past harm was inflicted by either the Nepalese government or any group or individuals that the government was unable or unwilling to control, and therefore the BIA considered "the issue waived." However, the BIA's characterization is not supported by the record. For example, Budhathoki's brief to the BIA states in part: "The country condition reports all objectively confirmed that during the time that [Budhathoki] was persecuted by the Maoists in Nepal, the Maoists were alternately part of the government, or waging a savage war against the government and its civilians and the government could not control them or was unwilling to do so." Administrative Record ("AR") 19; *see also* AR 13-14. Moreover, the government acknowledges that we may review this issue because the BIA addressed it on the merits. *See Rodriguez-Castellon v. Holder*, 733 F.3d 847, 852 (9th Cir. 2013).

testimony or documentary evidence explaining why a victim did not report." *Id.* at 1069.

Here, the IJ rejected Budhathoki's assertion that the government authorities would be unable or unwilling to protect him from the Maoists and YCL. Referring to a report titled "Major incidents of terrorist violence in Nepal, 1999-2010," found at AR 313-17, the IJ stated that Budhathoki's view was "refuted by the background documents . . . that note incidents of the police going after and killing Maoists during the 2006 to 2008 period, which is the time period that [Budhathoki] asserts that the incidents of confrontation occurred to him" and showed that the Nepalese "government was challenging and killing Maoists during the period of time when [Budhathoki] asserts that he suffered these incidents." In addition, regarding the second incident in 2008, the IJ noted that "the police actually were present either during the latter portion or immediately following the portion of [Budhathoki's] contacts with the YCL members in the tea shop, yet [Budhathoki] took no action to report the incident to the police such that they would have been in a position to investigate, follow, arrest or detain or otherwise take action against the YCL members who had threatened [Budhathoki] in the tea shop."

However, as the government acknowledges in its answering brief, a 2007 report from the U.S. State Department, Bureau of Democracy, Human Rights, and Labor ("2007 State Department Report"), found at AR 347-68, "shows that, in the

4

years following the November 2006 peace agreement that ended the Maoists'

decade-long insurgency, the Nepal government and the police often did not

intervene or investigate the violent actions committed by the Maoists and YCL

members."  Among other things, this report states:

- "Nepal . . . is in a state of political transition.  It is operating under an interim political system . . . .  [It has] a multiparty coalition government, which includes members of the Communist Party of Nepal-Maoist (CPN-M)."  AR 347.

- "The November 2006 peace agreement between the then-Seven-Party alliance and the Maoists ended the decade-long insurgency and called for the Nepal Police (NP) and the Armed Police Force (APF) to enforce law and order across the country. Authorities reestablished many police posts, but Maoists, or their subsidiary organization, the Young Communist League (YCL), prevented some from being reestablished and subsequently forced others to close. . . .  Lacking political backing, police were often reluctant to intervene, particularly against the Maoists or YCL members."  AR 347.

- "The government failed to conduct thorough and independent investigations of reports of security force or Maoist/YCL brutality and generally did not take significant disciplinary action against those involved.  Citizens were afraid to bring cases against the police for fear of reprisals."  AR 349-50.

- "The November 2006 peace agreement called on the NP and the APF to enforce law and order across the country.  Authorities reestablished several police posts, but the Maoists forced some of the reestablished posts to close.  The police stood aside during most incidents of violence, particularly events involving Maoists. According to police accounts, government officials instructed police not to intervene in the case of Maoist violence for fear of endangering the peace process.  There were multiple events during the year in which police detained Maoist and YCL cadres for illegal acts, only to see them freed by political leadership within

the Home Ministry or after intervention by other political leaders." AR 351.

Further, the report on "Major incidents of terrorist violence in Nepal, 1999-2010," indicates a significant difference in the number of interactions between the Nepalese government and the Maoists in 2006 compared to 2007 and 2008.

Based on the record, including the 2007 State Department Report, we hold that substantial evidence does not support the BIA's conclusion that Budhathoki failed to show that the past harm he suffered was inflicted by either the Nepalese government or any group or individuals that the government was unable or unwilling to control. Therefore, we remand Budhathoki's claim of past persecution to the BIA for its further review.

Because we remand regarding whether Budhathoki suffered past persecution, we also remand regarding future persecution. *See Singh v. Whitaker*, 914 F.3d 654, 659 (9th Cir. 2019) ("Past persecution triggers a rebuttable presumption of a well-founded fear of future persecution." (citation and internal quotation marks omitted)).

**PETITION FOR REVIEW GRANTED; REMANDED**.