16-3478-ag
Yan Yang v. Barr

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

_____

August Term, 2017

(Argued: May 17, 2018                                    Decided: July 2, 2019)

Docket No. 16-3478-ag

_____

YAN YANG,

*Petitioner*,

v.

WILLIAM P. BARR, UNITED STATES ATTORNEY GENERAL,

*Respondent*.

_____

Before: POOLER, WESLEY, and LOHIER, *Circuit Judges*.

Petition for review of a decision by the Board of Immigration Appeals,

denying Yan Yang's application for asylum. We hold that once Yang

demonstrated the existence of changed circumstances permitting her late filing,

the Immigration Judge and Board of Immigration Appeals were obligated to

consider her entire application, because nothing in the plain language of the

statute limits review to the specific claim that formed the basis of the changed

circumstance. Accordingly, we GRANT the petition for review and REMAND

the application for asylum to the BIA for the limited purpose of granting the

application.

Judge Wesley dissents in a separate opinion.

Judge Lohier concurs in a separate opinion.

Granted and REMANDED.

—————————————

> GARY J. YERMAN, New York, NY, *for Petitioner Yan Yang.*
>
> STEFANIE NOTARINO HENNES, Trial Attorney, Office of Immigration Litigation (Leslie McKay, Senior Litigation Counsel, Office of Immigration Litigation, *on the brief*), *for* Chad A. Readler, Acting Assistant Attorney General, Civil Division, United States Department of Justice, Washington, D.C., *for Respondent William P. Barr, United States Attorney General.*

POOLER, *Circuit Judge*:

We are asked to determine whether the Immigration and Nationality Act's

("INA") exception for late filing applies only to changed circumstances

2

underpinning a successful claim, or whether the changed circumstances permit

an application for asylum on multiple bases, including bases that are unrelated to

the changed circumstances. We hold that the plain language of the statute

unambiguously permits an applicant to raise multiple claims in her asylum

application, even if the changed circumstance relates only to one proffered basis

for asylum. Accordingly, we grant the petition for review and remand the

application to the Board of Immigration Appeals ("BIA") for the limited purpose

of granting Yang's application for asylum.[1]

## BACKGROUND

Yan Yang was born in China in 1973. In September 1992, Yang met her

husband, Shen Zhonghua, while she was working in a garment factory in

Shenzhen. On July 6, 1994, Yang and Zhonghua returned to his hometown of

Wutong Town to register their marriage with the government. Yang and her

husband were both required to submit to a mandatory physical examination at a

hospital before the local government would register their marriage. This exam

---

[1] For reasons explained in Section II, the government abandoned any additional challenges to Yang's eligibility for asylum on the basis of her forced abortion in China. Having decided the one issue on appeal, there is no other issue to be decided.

revealed that Yang was "pregnant without prior authorization" since she and Zhonghua were not yet married. Certified Administrative Record ("CAR") at 536. Yang was immediately forced to have an abortion.

Yang entered the United States on a tourist visa on June 3, 2002, but remained in the United States after her temporary visa expired and gave birth to her U.S.-citizen son in October 2004. In July 2012, Yang began attending a Christian church and was baptized into the church on September 23, 2012.

On her own initiative, prior to any removal proceedings, Yang affirmatively filed an application for asylum on October 17, 2012 on two bases: her forced abortion in China and her recent conversion to Christianity. Though asylum applications must be filed within one year of the applicant's arrival in the United States, 8 U.S.C. § 1158(a)(2)(B), applications may be filed beyond that deadline if the applicant can demonstrate "changed circumstances which materially affect the applicant's eligibility for asylum," 8 U.S.C. § 1158(a)(2)(D). Yang submitted her application over a decade after her arrival to the United States, but within one month of her conversion to Christianity.[2]

---

[2] The applicant must file her application within a "reasonable period" in light of the changed circumstances. 8 C.F.R. § 1208.4(a)(4)(ii).

On December 11, 2012, however, she was served with a Notice to Appear charging her with removability for overstaying her visa. On March 11, 2015, the Immigration Judge ("IJ") denied her application for asylum. The IJ determined that the exception for "changed circumstances" applied only to Yang's religious asylum claim, effectively severing the application into its two separate claims. The IJ found that Yang was credible on all counts, but that there was insufficient evidence of persecution of Christians in China to grant the asylum application on that basis. The IJ did not consider Yang's asylum claim based on her forced abortion because the IJ determined that the claim was not timely filed, but the IJ found Yang's story credible and granted her withholding of removal on the basis of that claim. On September 20, 2016, the IJ's decision was affirmed in all respects by the BIA.

## DISCUSSION

"When the BIA does not expressly adopt the IJ's decision, but its brief opinion closely tracks the IJ's reasoning, this Court may consider both the IJ's and the BIA's opinions for the sake of completeness." *Zaman v. Mukasey*, 514 F.3d 233, 237 (2d Cir. 2008) (internal quotation marks omitted). Neither the IJ nor the BIA offered any substantive analysis of the question facing us in this appeal,

namely, whether a changed circumstance affecting eligibility for one asylum claim renders the properly filed asylum application timely filed for all claims. Instead, both the IJ and the BIA assumed that the plain language of the statute barred the IJ from considering Yang's forced abortion claim. Yang argues to this Court, as she did before the BIA, that the plain language of the statute requires consideration of her full asylum application.

The government urges us to defer to the BIA's decision insofar as that decision has the "power to persuade." *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944); *see also Christensen v. Harris Cty.*, 529 U.S. 576, 587 (2000) (holding that "interpretations contained in policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law—do not warrant *Chevron*-style deference," but may be entitled to *Skidmore* deference). But because we find there is no ambiguity in the statutory language, and that "Congress has directly spoken to the precise question at issue," *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842 (1984), there is no need for deference or remand under any of our existing models of deference to agency adjudication. We additionally observe that it is undisputed that an IJ's construction of the INA is entitled to no deference, *Li v. INS*, 453 F.3d 129, 136 (2d Cir. 2006), and we have

previously held that "the BIA's nonprecedential single-member decision" is not accorded Chevron deference, because it was not "promulgated under its authority to make rules carrying the force of law." *Rotimi v. Gonzales*, 473 F.3d 55, 57 (2d Cir. 2007)(internal quotation marks omitted). There is simply no basis on which deference is appropriate—let alone required—in this case. Because we are asked to resolve "a pure question of statutory construction,"[3] which is a question of law "for the courts to decide," *INS v. Cardoza-Fonseca*, 480 U.S. 421, 446 (1987), we therefore review these claims in the first instance, without remanding to the agency. Our review of this question of law is de novo. *Adams v. Holder*, 692 F.3d 91, 95 (2d Cir. 2012).

## I.  Plain Language of the Statute

"Our analysis begins with the text" of Section 1158(a)(2)(D), "and we look to both the language itself and the specific context in which that language is used." *Merit Mgmt. Grp., LP v. FTI Consulting, Inc.*, 138 S.Ct. 883, 893 (2018)

---

[3] Regarding the issue before us on appeal, there are no decisions from other circuit courts of appeals that directly address it, and there are no precedential BIA opinions on it. Indeed, the BIA has been inconsistent in its non-precedential interpretations of § 1158(a)(2)(D). *Compare* CAR at 45-46, *with In re Chen & Wu*, Nos. A089 918 765 & A089 918 766 (B.I.A. Apr. 13, 2012).

(internal quotation marks and brackets omitted). In doing so, we focus our attention on two key phrases within the section that are dispositive of the question presented in this appeal.

**A. "An application for asylum"**

In our first look at the plain language of the statute, we observe that the relevant section clearly states that "*[a]n application for asylum of an alien may be considered* . . . if the alien demonstrates . . . changed circumstances which materially affect the applicant's eligibility for asylum." 8 U.S.C. § 1158(a)(2)(D) (emphasis added). The plain language of the statute thus makes clear that changed circumstances provide for the consideration of *an application* for asylum, as opposed to a specific claim for asylum.

This reading of the plain language is reinforced by the specific context in which this provision appears. In aid of this effort, we examine the section headings and organizational structure of the relevant section of the INA. "Although section headings cannot limit the plain meaning of a statutory text, they supply cues as to what Congress intended." *Merit Mgmt.*, 138 S.Ct. at 893 (internal citation and quotation marks omitted). The section headings and organization of this section of the INA evince a clear intent to address the ability

8

to file an application for asylum, rather than an ability to be granted asylum or the ability to file a particular asylum claim.

Indeed, the relevant section of the INA is titled "Authority to apply for asylum."[4] That section is further divided into three parts: (1) In general, (2) Exceptions, and (3) Limitations on judicial review. The first part ("In general") establishes the basic framework establishing the authority to apply for asylum:

> (1)  In general. – Any alien who is physically present in the United States or who arrives in the United States (whether or not at a designated port of arrival and including an alien who is brought to the United States after having been interdicted in international or United States waters), irrespective of such alien's status, may apply for asylum in accordance with this section or, where applicable, section 1225(b) [regarding the inspection of arriving aliens].[5]

8 U.S.C. § 1158(a)(1). After laying out the basic premise regarding who may apply for asylum, Section 1158(a) next turns to the "Exceptions" to the general

---

[4] Section 1158 of the INA addresses asylum and is divided into five sections: Authority to apply for asylum (subsection a), Conditions for granting asylum (subsection b), Asylum status (subsection c), Asylum procedure (subsection d), and Commonwealth of the Northern Mariana Islands (subsection e). The relevant provision to this appeal appears in subsection a, titled "Authority to apply for asylum."

[5] The immediately preceding section of the INA—Section 1157—addresses refugees. The "In general" portion of Section 1158 appears designed at least in part to clearly distinguish asylees from refugees and to codify the right to apply for asylum.

framework *permitting* asylum applications in order to establish three specific situations in which foreign nationals may *not* apply for asylum (in other words, a foreign national's application for asylum may not be considered). 8 U.S.C. § 1158(a)(2). The statute explains that the general framework regarding asylum applications "shall not apply:" when the foreign national may be removed to a "safe third country," Section 1158(a)(2)(A), when the foreign national has not "demonstrate[d] by clear and convincing evidence that the application has been filed within 1 year after the date of the alien's arrival in the United States," Section 1158(a)(2)(B), or when the foreign national has "previously applied for asylum and had such application denied," Section 1158(a)(2)(C).[6] The "Exceptions" section, however, also contains an exception to the exception which is the issue of this appeal: the existence of "changed circumstances."[7] Section 1158(a)(2)(D).

---

[6] These exceptions are titled "Safe third country," "Time limit," and "Previous asylum applications," respectively.

[7] The final portion of the "Exceptions" section addresses unaccompanied minors and specifies that the safe third country and time limit bars "shall not apply" to those applicants. 8 U.S.C. § 1158(a)(2)(E).

The exclusion from consideration of subsequent asylum applications and applications filed after the one-year deadline does not apply in two specific circumstances:

> An application for asylum of an alien may be considered notwithstanding [the bars for late filings or successive filings], if the alien demonstrates to the satisfaction of the Attorney General either the existence of changed circumstances which materially affect the applicant's eligibility for asylum or extraordinary circumstances relating to the delay in filing an application within the period specified in [the paragraph establishing the one-year filing deadline].

8 U.S.C. § 1158(a)(2)(D). The statutory language is structured to directly refer to the preceding portions of the section. The statute states that "[a]n application for asylum . . . may be considered, *notwithstanding* [the time limit and previous application bars] if the alien demonstrates . . . ." *Id*. (emphasis added). In other words, the general rule is that applications may not be considered when they are filed after the time limit or when previous applications have been denied, but this section establishes that those normal bars to applications do not apply if the foreign national can demonstrate changed circumstances or extraordinary circumstances regarding the filing delay. The language and structure of this section make clear that the existence of changed circumstances "operates as an exception" to § 1158(a)(2)(B-C). *Merit Mgmt.*, 138 S.Ct. at 893; *see also id*. (quoting

11

A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts 126 (2012) ("A dependent phrase that begins with *notwithstanding* indicates that the main clause that it introduces or follows derogates from the provision to which it refers")).

The key observation for purposes of this appeal is that the exception is to the bar to considering *applications*, not claims. Recall that the "Exceptions" subsection is part of the larger section titled "Authority to apply for asylum" and that the language of the relevant provision titled "Changed circumstances" addresses only the "application for asylum," as opposed to the specific claim or claims within an application. Even if we were to substitute the word "request" for "application," as the dissent speculates Congress intended, the observation remains the same: the exception is to the bar to considering "requests," not claims. An individual may make one "request" for asylum because she fears religious persecution *and* because she was forced to have an abortion. Indeed, there is simply no basis for a claim-specific limitation in the statutory text itself, which refers only to applications for asylum. Or, more technically, the dependent clause containing the statutory bars derogates from the main clause providing for the consideration of an *application* for asylum, with no additional limiting

language. Rather than grapple with this textual clarity, the dissent fixates on the context of the statute and its view of the  statute's true purpose to call into question the "logic" of the majority view. But in doing so, and to generate ambiguity, the dissent puts its interpretation of legislative history before plain text.

Indeed, an examination of "the broader statutory structure," *Merit Mgmt.*, 138 S.Ct. at 893, confirms our interpretation of the language regarding "changed circumstances." The alternative view—that the "changed circumstance" must relate directly to the claim on which asylum is eventually granted—runs counter to the language and organizational structure of the statute. In essence, it would collapse into one step the two separate steps of applying for asylum and determining whether asylum should actually be granted. These two steps are plainly two separate sections of the statute—Authority to apply for asylum, Section 1158(a), and Conditions for granting asylum, Section 1158(b)—which suggests to us that Congress assumed that determining authority to simply apply for asylum would be a separate step from determining whether an applicant could be granted asylum. Indeed, the asylum application itself contemplates that an applicant may apply for asylum on multiple bases, listing

13

various possible claims for asylum (based, e.g., on race, political opinion, religion) and instructing the applicant to "check the appropriate box(es)" to explain why they are applying for asylum or withholding of removal. U.S. Citizenship and Immigration Services, Form I-589, Application for Asylum and for Withholding of Removal, Part B(1). This Court has previously articulated this view of the two-step process, observing that "it is not necessary for the applicant to identify the correct ground; the fact finder should consider all or any combination of them" when reviewing an asylum application. *Osorio v. INS*, 18 F.3d 1017, 1027 (2d Cir. 1994). It is clear to us that the plain language of the statute refers to the *application* as a whole.

### B. "Materially affect the applicant's eligibility for asylum"

The government argues that "changed circumstances must relate to the applicant's eligibility for asylum" and asserts that this paraphrase of the statutory language demands that we deny Yang's petition for review. We disagree. To state the matter very directly, though an asylum applicant is indisputably required to demonstrate a changed circumstance that "materially affect[s] the applicant's eligibility for asylum," Section 1158(a)(2)(D), the plain language of this requirement is simply that the changed circumstance must

14

"materially affect" an applicant's eligibility for asylum. And surely that is precisely what occurred in this case. The IJ determined that Yang had in fact demonstrated such a changed circumstance, because it is impossible to be religiously persecuted on the grounds of Christian faith before becoming a Christian.

Despite the dissent's worry that "all an asylum seeker need do" to avoid the one-year bar is "allege changed circumstances," not every "changed circumstance" will render an applicant eligible for asylum; indeed, very few will. But so long as the applicant can demonstrate a change in circumstance that materially affects her eligibility to apply for asylum, there is simply nothing in the plain statutory language to suggest—let alone demand—that only that claim may be reviewed. As the Ninth Circuit noted in *Vahora v. Holder*, on which the dissent relies, the changed circumstances exception to the one-year filing requirement was "intended to be broad," not limited. 641 F.3d 1038, 1045 (9th Cir. 2011). The text of the statute comports with this intent. We simply do not see any portion of the statute articulating the view that the government urges upon us. In order to argue the contrary, the dissent variously maintains that "eligibility" means "a determination that an applicant is a refugee" and the

applicant's "successful showing that she is a refugee." The use of such shifting definitions highlights a misapprehension of the statutory context; the dissent conflates two separate steps of the asylum process in a manner that is flatly contradicted by the statutory text.

Because we have carefully read the statutory text and find the meaning of the statutory language clear and unambiguous, we have no need to look further. Our search for meaning thus begins and ends with the statutory language itself. *See Marvel Characters*, *Inc. v. Simon*, 310 F.3d 280, 290 (2d Cir. 2002) ("When the language of a statute is unambiguous, judicial inquiry is complete.") (internal quotation marks omitted). If a foreign national is able to demonstrate "changed circumstances which materially affect the applicant's eligibility for asylum," that individual may file their "application for asylum" "notwithstanding" the bar on applications filed after one year of the foreign national's arrival in the United States.

**II. Yang's Application for Asylum**

As dictated by the statutory language governing asylum applications, Yang's untimely application fell within the "time limit" exception to the general rule permitting foreign nationals physically present in the United States to apply

16

for asylum. Yang, however, successfully argued before the IJ and the BIA that her application also fell within the "changed circumstances" exception to the exception, because she had recently converted to Christianity. Yang's asylum application presented two possible bases for asylum: religious persecution and her forced abortion in China. The IJ bifurcated Yang's asylum application and determined that her forced abortion claim was "time-barred" while her religious persecution claim was timely. CAR at 45-46. The IJ thus considered "only her religion-based asylum claim." CAR at 46.

In doing so, the IJ found that "the respondent testified credibly and adequately corroborated her testimony" regarding both her forced abortion and her religious conversion. CAR at 45. The IJ also found that "the respondent has not demonstrated a well-founded fear of future persecution on account of her religion" and thus denied her asylum claim. CAR at 47. The IJ, however, granted Yang withholding of removal under 8 U.S.C. § 1231(b)(3) based on her forced abortion in China. The IJ explained that Yang "testified credibly and provided substantial evidence to demonstrate that she was coerced into an abortion in 1994 because she became pregnant without authorization." CAR at 47. The IJ properly relied on *Cao v. U.S. Department of Justice* in holding that Yang therefore had an

17

"irrebuttable presumption of a well-founded fear of future persecution" and thus qualified for withholding of removal on that basis. 421 F.3d 149, 156 (2d Cir. 2005). The BIA affirmed the IJ's decision on all grounds.

As *Cao* recounts, in 1996 Congress amended the definition of "refugee" in the INA to make forced abortions and other population control measures an explicit ground for asylum:

> For purposes of determinations under this chapter, a person who has been forced to abort a pregnancy or to undergo involuntary sterilization, or who has been persecuted for failure or refusal to undergo such a procedure or for other resistance to a coercive population control program, shall be deemed to have been persecuted on account of political opinion . . . .

8 U.S.C. § 1101(a)(42); *see also Cao*, 421 F.3d at 155. As Yang's case reminds us, this statutory language does not guarantee that an individual who has undergone a forced abortion will be eligible for asylum; in addition to demonstrating past persecution or a well-founded fear of future persecution, an asylum applicant must show that she meets all the other criteria for asylum and does not fall within one of the statutory bars preventing her from receiving asylum.

Apart from the timeliness issue, the government has raised other no challenge to Yang's application for asylum on the basis of her forced abortion in China. Because we have determined that it was error for the IJ to bifurcate Yang's

18

asylum application and that the "changed circumstances" of her religious conversion made her entire asylum application timely filed, and because the IJ determined Yang was credible on the forced abortion claim, Yang's application for asylum must therefore be granted

## CONCLUSION

The plain language of the statute compels our conclusion today that the "changed circumstances" exception to the one-year deadline for an asylum application refers to the entire asylum application, rather than the individual claim. We observe that this reading of the statutory language merely provides an opportunity for an application to be considered by the IJ. The applicant is still required to demonstrate asylum eligibility before that status will be granted.

Yang's petition for review is thus GRANTED and her underlying asylum application is REMANDED to the BIA for the limited purpose of granting the application.

WESLEY, *Circuit Judge*, dissenting:

The majority takes comfort in the language of 8 U.S.C. § 1158(a)(2)(D). The text, the majority concludes, unambiguously permits a foreign national to evade the one-year time bar for *each and every one* of her asylum claims, so long as the application contains *at least one* claim for which she can establish changed circumstances. I disagree.

The changed-circumstances exception is a measure of legislative grace; it excuses the one-year limit where recent changes materially affect the alien's asylum eligibility. But "eligibility" is a discrete matter. It is particular to the facts and circumstances of each claim for asylum. The majority's reading of the statute, in contrast, extends that act of grace to cover all claims so long as any one claim meets the changed-circumstances exception, and it does so based on a strained reading of the phrase "application for asylum."

The majority's interpretation is, at best, one of two plausible interpretations. When that is the case, the statute is ambiguous, and we may consider other interpretive tools—including Congressional intent. *Natural Resources Defense Council, Inc. v. Muszynski*, 268 F.3d 91, 98 (2d Cir. 2001). Let's begin with the text. 8 U.S.C. § 1158(a)(2)(D) provides:

> An application for asylum of an alien may be considered, notwithstanding [time limitations], if the alien demonstrates to the satisfaction of the Attorney General either the existence of changed circumstances which materially affect the applicant's eligibility for asylum or extraordinary circumstance relating to the delay in filing an application within the [statutory time frame].

The majority concludes that "application" refers to the physical document that a putative asylee submits to the Department of Homeland Security. *Supra* at 13 ("the asylum application itself contemplates that an applicant may apply for asylum on multiple bases, listing various possible claims for asylum . . . and instructing the applicant to 'check the appropriate box(es)' to explain why they are applying for asylum or withholding of removal" (quoting Dep't of Homeland Security Form I-589, https://www.uscis.gov/i-589)). The problem is that is not how the statute uses the word.

"[I]dentical words and phrases within the same statute should normally be given the same meaning." *FCC v. AT & T, Inc.*, 562 U.S. 397, 408 (2011) (internal quotation marks omitted). The word "application" appears throughout the statute and therein, Congress has given it a broad, ordinary meaning: an application is a "request." *See Application*, *Black's Law Dictionary* (10th ed. 2014) (defining "application" as "[a] request or petition"). For example, 8 U.S.C. § 1187(a)(3)

requires an alien to have a valid passport "at the time of application for admission."[1]

I do not, nor could I, dispute that the physical form that an asylum seeker must submit instructs the applicant to indicate the claim or claims upon which she is seeking asylum. *Supra* at 13–14 (referencing Dep't of Homeland Security Form I-589, https://www.uscis.gov/i-589). In the narrowest sense, then, "an application for asylum" is not claim-specific: the form expressly invites an applicant to check as many boxes as she sees fit to assert multiple claims on various grounds. The form may allow multiple claims in one application, but there are at least three problems with reading the statute in this way.

---

[1] *See also* § 1255(a) (an immigrant's status may be adjusted by the Attorney General if "(1) the alien makes *an application* for such an adjustment, (2) the alien is eligible to receive an immigrant visa and is admissible to the United States for permanent residence, and (3) an immigrant visa is immediately available to him at the time his application is filed" (emphasis added)); *id.* § 1229b(b)(1)(A) (providing that the Attorney General may cancel removal and adjust an alien's status under some limited conditions, including where the alien "has been physically present in the United States for a continuous period of not less than 10 years immediately preceding the date of such application"); *id.* § 1229a(b)(4)(B) (referring to an alien's rights in a deportation proceeding as not applying to examining national security evidence proffered "in opposition to the alien's admission to the United States or to an application by the alien for discretionary relief"); *id.* § 1182(a)(2)(ii)(I) (describing an exception to a bar on admission based on criminal conduct if the alien was a juvenile at the time of the offense and the crime took place "more than 5 years before the date of application for a visa or other documentation and the date of application for admission to the United States").

*First*, there is no textual reason to assume that Congress was referring to a physical document when it used the phrase "application for asylum." Indeed, the more natural reading is to give the word "application" the same meaning in this section of the statute as it has in other sections. Substitute the word "application" with the word "request" in section 1158(a)(2)(D) and the text reads: "A request for asylum of an alien may be considered notwithstanding [time limitations], if the alien demonstrates . . . the existence of changed circumstances . . . " 8 U.S.C. § 1158(a)(2)(D). This reading makes § 1158(a)(2)(D) claim-specific: the use of the singular to describe the "application" or "request" is a strong textual signal that, in order to evade the one-year bar, an asylum-seeker must demonstrate that her untimely claim has been materially affected by changed circumstances.

*Second*, giving the phrase "application for asylum" the meaning that the majority ascribes to it ignores that § 1158(a)(2)(D) explicitly references § 1125(b), which, in turn, describes the process for inspection of applicants for admission and which assumes that the process is claim-specific. *See* § 1225(b)(1)(B)(v) (defining "credible fear of persecution" in the context of an "application for asylum" as "a significant possibility, taking into account the credibility of the statements made by the alien in support of the alien's *claim* and such other facts as are known to the

4

officer, that the alien could establish eligibility for asylum under section 1158 of this title" (emphasis added)).

*Third*, the statute uses the phrase "eligibility for asylum," which refers to a determination that an applicant "is a refugee within the meaning of section 1101(a)(42)(A)." 8 U.S.C. § 1158(b)(1)(A). The term "refugee" is defined:

> [A]ny person who is outside [his or her home country] and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion.

*Id.* § 1101(a)(42)(A).

Refugee claims are issue-specific: a person may be a racial refugee, a religious refugee, a nationality-based refugee, a social refugee, or a political refugee. To obtain refugee status, a person must establish that she has a complete claim based on at least one of those categories; a half-baked claim based on religious persecution does not cross the finish line with an extra push from a somewhat-persuasive showing of political persecution. *See Osorio v. I.N.S.*, 18 F.3d 1017, 1028 (2d Cir. 1994) (describing *I.N.S. v. Elias-Zacarias*, 502 U.S. 478, 482–83 (1992) and explaining that an applicant for asylum who fears persecution for

religious and political beliefs has two claims—one for religious asylum and one for political asylum)). That matters here because although the physical document called an "application for asylum" may encompass more than one claim, a person's "eligibility for asylum" involves one claim at a time.

Specifically, give "eligibility" its dictionary definition: "qualified to participate or be chosen." *Eligible*, Merriam-Webster, https://www.merriam-webster.com/dictionary/eligible (July 18, 2018). Thus, a person is "eligible for asylum" if the person is "qualified to be chosen for refugee status." A person cannot be "qualified to be chosen for refugee status" unless she can show changed circumstances in her home country that materially affect her successful showing that she is a refugee. This reading of the statute makes sense—it provides a safe haven from the one-year time bar for applicants who, after being in the United States for more than a year, realize that they cannot return to their home country because they have since become refugees and going back now would be dangerous.

A final point on ambiguity. The majority treats asylum determinations as a two-step process, which they say stems from the statute's organizational structure. Step one relates to an alien's ability to file an application, while step two involves

the merits of that application. Thus, they conclude, because the one-year bar appears in the statutory section entitled "Authority to apply for asylum," the exceptions to the bar must only come into play at step one—the filing of an application. *Supra* at 13–14. I acknowledge that structurally, this makes some sense.

But that reading *creates* a structural problem as well. The majority does not address the fact that, under their interpretation, the one-year bar (the rule) is swallowed by the exception (changed circumstances): all an asylum seeker need do to escape the one-year bar for a stale asylum claim is allege changed circumstances for an unrelated claim. As an organizational matter, this is problematic. "Congress . . . does not, one might say, hide elephants in mouseholes." *Whitman v. Am. Trucking Assns., Inc.*, 531 U.S. 457, 468 (2001).

The majority may disagree that my interpretation of the statute is the *correct* reading, but it is at least a *plausible* interpretation. Indeed, the majority acknowledges that "the BIA has been inconsistent in its non-precedential interpretations of § 1158(a)(2)(D)." *Supra* at 7 n.3. The agency has issued two decisions interpreting the statute; one supports the majority view and the other mine. *Compare In re Chen & Wu*, A089918765 & A089918766 (B.I.A. April 13, 2012)

(unpublished) (concluding that "[t]he plain language of [§ 1158(a)(2)(D)] requires the [alien] to demonstrate changed circumstances that materially affect her *eligibility* for asylum" and that "[e]ligibility for asylum is not dependent on a specific underlying basis of the asylum claim") *with In re Yang*, A205621131, at 7–8 (B.I.A. March 11, 2015) (unpublished) (reproduced at CAR 45–45) (reaching the opposite conclusion). That the BIA has been inconsistent in unpublished decisions, though not binding on us, is a good signal that the statute has more than one plausible reading. In short, the statute is ambiguous. *Muszynski*, 268 F.3d at 98.

Moreover, even if the majority were correct about the plain language of the statute, I would still be forced to dissent. In the "rare and exceptional circumstances . . . where the application of the statute as written will produce a result demonstrably at odds with the intentions of its drafters," Congressional intent controls. *Demarest v. Manspeaker*, 498 U.S. 184, 190 (1991); *see also Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 571 (1982) ("[I]n rare cases the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters, and those intentions must be controlling."). In such cases, courts have "reserved some scope for adopting a restricted rather than a literal or usual meaning of [a statute's] words where acceptance of that meaning would

8

thwart the obvious purpose of the statute." *Griffin*, 458 U.S. at 571 (internal quotation marks and ellipses omitted); *see also Dada v. Mukasey*, 554 U.S. 1, 14–19 (2008) (in a case involving two provisions of the INA, each of which was unambiguous on its own, "[r]eading the [INA] as a whole" and selecting the interpretation that avoided an absurd result). Looking to the legislative history of the provision at issue here confirms that the majority's reading cannot be right.

In general, the purpose of a statute of limitations is to encourage the timely resolution of disputes before evidence is "obscured by the passage of time." *See United States v. Morgan*, 380 F.3d 698, 703 (2d Cir. 2004) (quoting *Toussie v. United States*, 397 U.S. 112, 114–15 (1970)). The purpose of § 1158 in particular is to encourage asylum seekers to file within a year of entering the United States and to thereby discourage fraudulent or baseless claims. *See Vahora v. Holder*, 641 F.3d 1038, 1045 (9th Cir. 2011) ("Congress's paramount objective in enacting the one-year bar was to prevent fraudulent claims.") (citing 141 Cong. Rec. E1635 (Aug. 3, 1995)).

But Congress was also mindful that life is not static. Country conditions can change with an election, a coup, or social instability; and people can experience life-changing conversions of conscience and faith. These kinds of changes are what

9

Congress had in mind when it passed the changed-circumstances exception. Senator Hatch, a major proponent of the one-year bar and the changed-circumstances exception, noted that the legislation was intended to address "situations like those in which the situation in the alien's home country may have changed, the applicant obtains more information about likely retribution he or she might face if the applicant returned home, and other situations that we in Congress may not be able to anticipate at this time." 142 Con. Rec. S11838–40 (Sept. 30, 1996) (statement of Sen. Hatch). The exception, therefore, was designed to capture cases where an immigrant's situation changed in an unpredictable way, making his or her return unsafe. It built in a measure of fairness to asylum seekers by acknowledging the unpredictable nature of prejudice and oppression and ensuring that should an immigrant's personal convictions or home-country conditions change, the time limit will give way even if those changes arise after the one-year bar expires. It was, in other words, intended to create a narrow exception, not to override the one-year bar any time an asylum seeker has multiple claims.

The facts of this case illustrate the failing of the majority's reading of the statute. The Immigration Judge ("IJ") found that Yang established changed

10

circumstances based on her conversion to Christianity. The issue for Yang, however, is that the IJ also found that she was not entitled to asylum on the basis of her conversion claim because "[t]he evidence does not support a well-founded fear of persecution in China on account of [Yang's] religion." CAR at 62. Yang's Form I-589 contains two claims: forced abortion and religious persecution. She is excused for not filing her religious persecution claim within one year of entry into the United States because her conversion occurred years later, but that changed circumstance had no "material[] [e]ffect [on] her eligibility for asylum" predicated on her forced abortion. There is no factual or legal connection between Yang's forced abortion in 1994 and her conversion to Christianity in 2012. Yang had a strong asylum claim for forced abortion when she arrived in the United States in 2002, but for some reason she did not raise it until 2012; no circumstances related to this claim have changed.

The obvious purpose of the time bar was to prevent cases where an immigrant enters the United States and only files for asylum years later. The majority's view of the statute abrogates that choice made by Congress. It holds that any claim that is dependent on changed circumstances also revives claims that would be time barred if they were raised solely on their own. The reason for

11

excusing one claim is extended to cover another for which there is no excuse. What is the logic in combining a long since time-barred claim with a distinct, unrelated claim that is predicated on changed conditions affecting only that "new" claim? Why would Congress do that? The majority has not offered any explanation for why Congress would revive stale claims like Yang's, and it has failed to do so for good reason. There is none.

I realize that my view of this statute would deny Yang asylum despite her credible testimony. The IJ did, however, grant her withholding of removal based on the forced abortion, and she will therefore remain in the United States with her son, should she so desire. Citizenship will not be an option for Yang, but she will not be deported. Yang's circumstances warrant empathy. The INA, however, already contains a safety valve to protect people in her position. *See* 8 C.F.R. § 208.16; *Gao v. Gonzalez*, 424 F.3d 122, 128 (2d Cir. 2005) (holding that an IJ has no discretion not to grant withholding of removal where an applicant establishes her eligibility for asylum and demonstrates that if she were deported, that her life or freedom would be threatened). There is no need for this Court to read the statute in such a way as to replace the congressionally-imposed time limitation with an exercise of judicial mercy. I dissent.

LOHIER, *Circuit Judge*, concurring:

In response to the Court's careful textual analysis of § 1158(a)(2)(D), my colleague in dissent asks, "Why would Congress do that?"  Dissent Op. at 12. We could just as easily ask, why not?  No rule of interpretation makes congressional mercy an oxymoron.  Nor is there a canon that permits us to ignore the plain language of an immigration statute like § 1158(a)(2)(D) just because those words happen to favor noncitizens.

The Government and the dissent suggest that relying on the usual or literal meaning of the text of § 1158(a)(2)(D) leads to a result at odds with the "obvious purpose" of Congress.  Dissent Op. at 9, 11.  They in effect resort to the canon of absurdity, without using the word.  Yet we reserve that rarest of canons for the truly absurd, that is, "where the result of applying the plain language would be, in a genuine sense, absurd, i.e., where it is quite impossible that Congress could have intended the result and where the alleged absurdity is so clear as to be obvious to most anyone."  Catskill Mountains Chapter of Trout Unlimited, Inc. v. EPA, 846 F.3d 492, 517 (2d Cir. 2017) (quotation marks omitted).  As the Court explains, the result in this case is not even close to "absurd."  It gives petitioners who are already eligible to be protected from removal on one claim an

opportunity to have another claim heard. In fact, there is no case I can think of where applying the Court's interpretation of § 1158(a)(2)(D) would allow a petitioner who is substantively ineligible for asylum to remain in this country. This case, where Yang can remain in the United States on her credible claim of a forced abortion in China, illustrates the point.

The dissent offers yet another reason to avoid the plain language of § 1158(a)(2)(D), divining ambiguity where there is none to justify its turn to legislative history. After acknowledging that the Court's interpretation of the text is plausible, Dissent Op. at 1, the dissent asserts that Congress "has given [the word 'application'] a broad, ordinary meaning: an application is a 'request,'" Dissent Op. at 2. Defining "application" to mean "request," the dissent contends, supports an alternative plausible interpretation. Namely, substituting the term "request" for the term "application" in § 1158(a)(2)(D) "makes § 1158(a)(2)(D) claim-specific." Dissent Op. at 4.

But the idea that Congress intended "application" to mean "request" in § 1158 rests on an interpretive flaw, ignores the actual statutory use of both terms, and upends our long-held view that "[a]s a general matter, the use of different words within the same statutory context strongly suggests that different

2

meanings were intended." United States v. Maria, 186 F.3d 65, 71 (2d Cir. 1999).

Section 1158(a)(2)(D) appears in Chapter 12 of the INA. Nothing in that chapter supports the conclusion that Congress meant to define the word "application" to mean "request." To the contrary, the relevant sections of Chapter 12 ascribe decidedly different meanings, not the same meaning, to the two words. Start with the fact that the same sections of Chapter 12 often use the terms "application" and "request" together. This alone signals that Congress did not attach the same meaning to both words. See Maria, 186 F.3d at 71. It is true that one section in Chapter 12 appears on the surface to use "request" and "application" interchangeably. Compare § 1188(a)(2), with § 1188(e)(2). But that provision involves issues that are far afield from Yang's case. By contrast, all of the other, relevant sections of Chapter 12 that contain both terms employ them differently. In these sections, "application" refers to a formal submission by the noncitizen to the government for a substantive statutory benefit, such as asylum or naturalization, while "request" refers to a procedural right, such as a hearing, provided by either the government or a court. See, e.g., § 1229c (referring to a noncitizen's application for voluntary departure and a noncitizen's request for a court order of voluntary departure); § 1446 (referring to a noncitizen's

3

application for naturalization and her right to request that her application be transferred to another district if she relocates); § 1447 (referring to a noncitizen's application for naturalization and her right to request a hearing if it is denied). An "application" may subsume a request (or multiple requests); but the terms are not equivalent. Cf. § 1182(n)(1), (2) (referring to employer-filed application to the Secretary of Labor).

Of course, the Court's interpretation of § 1158(a)(2)(D) would persevere even if one were to read "application" and "request" to mean the same thing. I agree entirely with the Court, therefore, that rewriting § 1158(a)(2)(D) to refer to a "request" rather than an "application" would not make the provision claim-specific. A "request" for a specific thing, like an "application" for a specific thing, may have more than one underlying basis. If in a criminal case you "request" a hearing to dismiss the indictment against you, the request can cover a variety of different grounds: Fifth or Sixth Amendment, say, as well as an alleged statutory violation, and so on. The Court correctly points out that, in the same way, Yang may have made one "request" for asylum on multiple bases.

So whether the terms "request" and "application" mean very slightly different things or the same thing, that would not lead to two different plausible interpretations of the clear text in this case.